FILED
IN CLERKS OFFICE

2025 OCT 30 PM 1:00

U.S.
DISTRICT OF MASS.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

THOMAS GREVE,

*Plaintiff,*

v.

CREDIT ACCEPTANCE CORPORATION;
CAPE COD CARZ LLC; RICHARD GRAVINA
a/k/a RICHARD GRAVINA SR.; RICHARD C.
GRAVINA a/k/a RICHARD GRAVINA JR.;
MARY ELLEN GRAVINA, as Trustee of NIKO
REALTY TRUST u/d/t dated January 19, 2017;
WYNN'S EXTENDED CARE, INC.; HYUNDAI
MOTOR AMERICA; HYUNDAI AMERICA
TECHNICAL CENTER, INCORPORATED;
HYUNDAI MOTOR MANUFACTURING
ALABAMA, LLC; BALISE MOTOR SALES
COMPANY; and CAPE HY, INC.,

*Defendants.*

Civil Action No.

**COMPLAINT &**
**DEMAND FOR JURY TRIAL**

## I.    INTRODUCTION

1.    This case arises from a predatory and fraudulent scheme that sold Plaintiff a dangerously defective used car through a usurious loan, leaving him with a crippling debt for a worthless vehicle and causing him significant financial and emotional harm. The scheme was executed by a network of defendants, each playing an indispensable role. Credit Acceptance Corporation, a national subprime auto lender, designed and controlled the predatory financing model, providing the software and financial incentives that encouraged its partner dealer, Cape Cod Carz LLC ("CCC"), to engage in deceptive sales practices. CCC, owned and operated by the Gravina family, lured Plaintiff with false advertisements, misrepresented the vehicle's condition,

1

and, at the point of sale, deceived him into purchasing an unwanted add-on product from Wynn's Extended Care, Inc., by falsely claiming it was mandatory.

2.       The vehicle at the heart of this fraudulent transaction, a 2011 Hyundai Sonata, was itself a ticking time bomb due to a catastrophic engine defect. The vehicle's defective engine was designed in part by Hyundai America Technical Center, Inc., manufactured by Hyundai Motor Manufacturing Alabama, LLC, and distributed and warranted by Hyundai Motor America. When the engine inevitably failed, Balise Hyundai of Cape Cod, an authorized dealership owned and controlled by its corporate parent Balise Motor Sales Company, willfully misrepresented the terms of HMA's warranty to wrongfully deny Plaintiff's claim for over a year, leaving him without a vehicle and accruing substantial expenses. This case seeks redress for this coordinated web of fraud, usury, and product liability that has profoundly injured Plaintiff.

## II.    **PARTIES**

3.       Plaintiff THOMAS GREVE ("Plaintiff") is a citizen of Rhode Island residing at 33 Dover Street, Cranston, RI 02920.

4.       Prior to May 11, 2025, Plaintiff was a citizen of Massachusetts residing at 123 Green Pond Road, East Falmouth, MA 02536.

5.       Plaintiff is a person within the meaning of Mass. Gen. Laws ch. 93A, §§ 1(a) and 9(1).

6.       Defendant CREDIT ACCEPTANCE CORPORATION ("CAC") is a corporation organized under the laws of the State of Michigan with its principal place of business located at 25505 West Twelve Mile Road, Suite 3000, Southfield, MI 48034.

7.       On or around January 27, 1988, CAC was issued a motor vehicle sales finance company license by the Massachusetts Division of Banks.

8.      On or around April 23, 1992, CAC registered as a foreign corporation with the Secretary of the Commonwealth of Massachusetts. CAC designated Corporation Service Company, located at 84 State Street, Boston, MA 02109, as its registered agent for service of process in Massachusetts.

9.      Defendant CAPE COD CARZ LLC ("CCC") is a limited liability company organized under the laws of the Commonwealth of Massachusetts with its principal place of business located at 153 Corporation Road, Hyannis, MA 02601.

10.     CCC does not have a motor vehicle sales finance company license as defined in Mass. Gen. Laws ch. 255B § 2.

11.     CCC is owned and operated by Gravina-1 and Gravina-2.

12.     Defendant RICHARD GRAVINA a/k/a RICHARD GRAVINA SR. ("Gravina-1") is a citizen of Massachusetts residing at 68 Loring Avenue, West Dennis, MA 02670.

13.     In the alternative, Gravina-1 is a citizen of Florida, residing in Lee County.

14.     Gravina-1 is a member and manager of CCC.

15.     Defendant RICHARD C. GRAVINA a/k/a RICHARD GRAVINA JR. ("Gravina-2") is a citizen of Massachusetts residing at 19 Schooner Lane, Hyannis, MA 02601.

16.     In the alternative, Gravina-2 resides at 68 Loring Avenue, West Dennis, MA 02670.

17.     Gravina-2 is the son of Gravina-1 and Gravina-3.

18.     Gravina-2 is a member and manager of CCC and is responsible for overseeing its daily business operations.

19.     Defendant MARY ELLEN GRAVINA, as Trustee of NIKO REALTY TRUST u/d/t dated January 19, 2017 ("Gravina-3") is a citizen of Massachusetts residing at 68 Loring Avenue, West Dennis, Barnstable County, Massachusetts 02670.

20.     In the alternative, Gravina-3 resides at 11 Heath Row, Marstons Mills, MA 02648. In the alternative, Gravina-3 is a citizen of Florida, residing in Lee County.

21.     Gravina-3 is the spouse of Gravina-1.

22.     Gravina-3 owns the real property known and numbered as 153 Corporation Road, Hyannis, MA 02601 ("CCC Facility").

23.     Gravina-3 rents the CCC Facility to CCC.

24.     Defendant WYNN'S EXTENDED CARE, INC. ("WEC") is a corporation organized under the laws of the State of California with its principal place of business located at 6303 Waterford District Drive, Suite 225, Miami, FL 33126.

25.     On or about September 30, 2003, WEC registered as a foreign corporation with the Secretary of the Commonwealth of Massachusetts. WEC designated CT Corporation System, located at 155 Federal Street, Suite 700, Boston, MA 02110, as its registered agent for service of process in Massachusetts.

26.     Defendant HYUNDAI MOTOR AMERICA ("HMA") is a corporation organized under the laws of California with its principal place of business located at 10550 Talbert Avenue, Fountain Valley, CA 92708.

27.     On or about August 11, 1986, HMA registered as a foreign corporation with the Secretary of the Commonwealth of Massachusetts.

4

28.     On or about May 27, 2021, HMA designated Corporation Service Company, located at 84 State Street, Boston, MA 02109, as its registered agent for service of process in Massachusetts.

29.     HMA is a wholly owned subsidiary of Hyundai Motor Company ("HMC").

30.     HMA oversees HMC's sales and other operations across the United States.

31.     Defendant HYUNDAI AMERICA TECHNICAL CENTER, INCORPORATED ("HATC") is a corporation organized under the laws of the State of Michigan with its principal place of business located at 6800 Geddes Road, Superior Township, Michigan 48198.

32.     On information and belief, HATC has an office in Massachusetts.

33.     HATC is a wholly owned subsidiary of HMC.

34.     HATC is HMC's design, technology, engineering, research, and development division for North America.

35.     Defendant HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC ("HMMA") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 700 Hyundai Blvd., Montgomery, AL 36105.

36.     HMMA is a wholly owned subsidiary of HMA.

37.     Defendant BALISE MOTOR SALES COMPANY ("BMSC") is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business located at 1441 Main Street, Suite 300, Springfield, MA 01103.

38.     BMSC is one of the largest auto dealers in New England and one of the top 100 dealer groups in the United States.

39.     BMSC owns and operates at least 25 car dealerships, five collision repair centers, a car wash business, and vehicle service centers, with locations across Massachusetts, Rhode Island, and Connecticut.

40.     Defendant CAPE HY, INC. d/b/a BALISE HYUNDAI OF CAPE COD ("BHCC") is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business located at 322 Falmouth Road, Hyannis, MA 02601.

41.     BHCC is a wholly owned subsidiary of BMSC.

## III.     JURISDICTION

*42.*     This Court has original subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331, because Plaintiff asserts claims arising under federal law—including violations of the Racketeering Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x, and the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

43.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's state law claims, because they are so related to the claims over which this Court has original jurisdiction, such that they form part of the same case or controversy.

44.     This Court has personal jurisdiction over CAC because CAC, directly or by an agent, transacts business in Massachusetts; contracts to supply services or things in Massachusetts; caused tortious injury by an act or omission in Massachusetts; and caused tortious injury by an act or omission outside Massachusetts while regularly doing or soliciting business, or engaging in a persistent course of conduct, or deriving substantial revenue from goods used or consumed or services rendered, in Massachusetts. Mass. Gen. Laws ch. 223A, § 3(a)–(d).

45.     This Court further has personal jurisdiction over CAC under 28 U.S.C. § 1965(b) because in any action brought pursuant to RICO in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it. Given these facts, and that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of personal jurisdiction over CAC.

46.     This Court has personal jurisdiction over CCC because CCC, directly or by an agent, transacts business in Massachusetts, contracts to supply services or things in Massachusetts, caused tortious injury by an act or omission in Massachusetts, and uses real property in Massachusetts. Mass. Gen. Laws ch. 223A, § 3(a)–(c), (e).

47.     This Court has personal jurisdiction over Gravina-1, Gravina-2, and Gravina-3 because Gravina-1, Gravina-2, and Gravina-3, directly or by an agent, caused tortious injury by an act or omission in Massachusetts and have an interest in, use or possess real property in Massachusetts. Mass. Gen. Laws ch. 223A, § 3(c), (e).

48.     In the alternative, this Court further has personal jurisdiction over Gravina-1 and Gravina-3 under 28 U.S.C. § 1965(b) because in any action brought pursuant to RICO in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it. Given these facts, and that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of personal jurisdiction over Gravina-1 and Gravina-3.

49.     This Court has personal jurisdiction over WEC because WEC, directly or by an agent, transacts business in Massachusetts; contracts to supply services or things in Massachusetts; caused tortious injury by an act or omission outside Massachusetts while regularly doing or soliciting business, or engaging in a persistent course of conduct, or deriving

substantial revenue from goods used or consumed or services rendered, in Massachusetts; and contracts to "insure any person, property or risk" located within Massachusetts at the time of contracting. Mass. Gen. Laws ch. 223A, § 3(a), (b), (d), (f).

50.     This Court further has personal jurisdiction over WEC under 28 U.S.C. § 1965(b) because in any action brought pursuant to RICO in a U.S. District Court, that Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it. Given these facts, and that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of personal jurisdiction over WEC.

51.     This Court has personal jurisdiction over HMA because HMA, directly or by an agent, transacts business in Massachusetts; contracts to supply services or things in Massachusetts; caused tortious injury by an act or omission in Massachusetts; and caused tortious injury by an act or omission outside Massachusetts while regularly doing or soliciting business, or engaging in a persistent course of conduct, or deriving substantial revenue from goods used or consumed or services rendered, in Massachusetts. Mass. Gen. Laws ch. 223A, § 3(a)–(d).

52.     This Court has personal jurisdiction over HATC because HATC, directly or by an agent, transacts business in Massachusetts; contracts to supply services or things in Massachusetts; caused tortious injury by an act or omission outside Massachusetts while regularly doing or soliciting business, or engaging in a persistent course of conduct, or deriving substantial revenue from goods used or consumed or services rendered, in Massachusetts; and has an interest in, uses or possesses real property in Massachusetts. Mass. Gen. Laws ch. 223A, § 3(a), (b), (d), (e).

53.     This Court has personal jurisdiction over HMMA because HMMA, directly or by an agent, contracts to supply services or things in Massachusetts and caused tortious injury by an act or omission outside Massachusetts while regularly doing or soliciting business, or engaging in a persistent course of conduct, or deriving substantial revenue from goods used or consumed or services rendered, in Massachusetts. Mass. Gen. Laws ch. 223A, § 3(b), (d).

54.     This Court has personal jurisdiction over BMSC and BHCC because BMSC and BHCC, directly or by an agent, transact business in Massachusetts; contract to supply services or things in Massachusetts; caused tortious injury by an act or omission in Massachusetts; and have an interest in, use or possess real property in Massachusetts. Mass. Gen. Laws ch. 223A, § 3(a)–(c), (e).

55.     Additionally, this Court has personal jurisdiction over CCC, Gravina-1, Gravina-2, Gravina-3, BMSC, and BHCC because they are domiciled in, organized under the laws of, or maintain their principal place of business in, Massachusetts. Mass. Gen. Laws ch. 223A, § 2.

## IV.    VENUE

56.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in the Commonwealth of Massachusetts and because all Defendants are subject to personal jurisdiction in this District.

57.     Venue is further proper in this District, pursuant to 18 U.S.C. § 1965, because CAC, CCC, Gravina-1, Gravina-2, Gravina-3, WEC, HMA, HATC, BMSC, and BHCC reside, are found, have an agent, or transact their affairs in this district.

## V.    FACTUAL ALLEGATIONS

### CAC Works with Car Dealers to Provide Financing for Car Sales

58.    CAC is one of the country's largest publicly traded auto lenders and does business with a network of more than 12,000 affiliated used-car dealers to offer subprime and deep-prime loans. In 2020 alone, consumers obtained more than $4.9 billion in CAC-financed loans.

59.    CAC offers a finance program allowing approved car dealerships ("Dealers") to sell vehicles on credit to consumers. Through that program, it accepts assignment of retail installment contracts ("RICs") between Dealers and their customers. CAC then administers, services, and collects payments from consumers pursuant to these RICs.

60.    CAC maintains a close relationship with its Dealers. CAC's Dealers must adhere to the operational guidelines of CAC's financing program, and the Dealers' staff are required to attend and receive certification through CAC's "University" training program. CAC also provides marketing materials and plans to its Dealers and licenses the use of its trademarks and slogans, like "WE CHANGE LIVES" and "GUARANTEED CREDIT APPROVAL."

61.    When a Dealer sells a vehicle that is financed by a loan agreement with CAC, CAC pays the Dealer for assignment of the loan. CAC will sometimes require a Dealer to sign a certain number of customers to CAC loan agreements before CAC will pay out the Dealer's full earnings. Dealers therefore have an incentive to steer customers towards a CAC loan, rather than other alternatives.

62.    CAC also uses a rating system to rate its Dealers. A Dealer's rating affects the total payment that CAC will offer the Dealer in a given transaction—the higher a Dealer's rating, the higher the payment from CAC. Dealers therefore have an additional incentive to steer customers toward a CAC loan.

**CAC Uses Proprietary Methodology and Software to
Determine the Loans It Will Offer Through Its Dealers**

63.     In calculating the loan that an applicant is qualified for, CAC's methodology does not consider the applicant's actual ability to repay the loan. Instead, the methodology takes into consideration the applicant's personal and financial information and generates a score from 0 to 100 ("CAC Score") for the applicant. The CAC Score directly correlates to the net amount that CAC expects it will collect on the loan. For example, a CAC Score of 50 means that CAC predicts collecting 50 cents for each dollar owed on the applicant's loan.

64.     The CAC Score does not only consider the payments that CAC expects that an applicant will make under their loan agreement. It also considers other amounts that CAC expects to collect if, and when, the loan goes bad—this includes everything from expected late fees to the expected proceeds from auctioning a repossessed vehicle.

65.     CAC has proprietary software ("CAC Software") that its Dealers use to evaluate applicants and generate potential loan agreements. The CAC Software calculates a loan agreement given certain data inputs, such as the vehicle's price, the term of the proposed loan, and whether any "add-ons" are purchased.

66.     The CAC Software also displays the amount that CAC will pay the Dealer for the loan ("CAC Payment"). By varying the data inputs in the CAC Software, a Dealer can increase or decrease the CAC Payment.

67.     Once a Dealer finalizes a transaction, the CAC Software generates the terms and documents for the loan.

**CAC's Model Incentivizes Dealers to Maximize the Total Cost of a Loan**

68.     When a Dealer sells a vehicle that is financed by a loan agreement with CAC, the Dealer's proceeds on the sale are compromised primarily of its payment from CAC ("CAC

11

Payment"), any down payment that has been placed, and the value of any trade-in associated with the sale. Together, these three amounts (collectively, "Dealer Compensation") constitute substantially all of the money that a Dealer will ever receive in the transaction.

69.     Because the Dealer Compensation constitutes substantially all of the money that a Dealer will earn when it sells a vehicle, it is a proxy for the true cash price of a given transaction—that is, the amount that a seller would need to earn from a transaction to make an acceptable profit.

70.     As a result, the linchpin of CAC's business model is determining the right CAC Payment to offer to a dealer: the "ideal" CAC Payment will provide a Dealer with an acceptable profit margin, thereby incentivizing the Dealer to complete the sale. CAC itself has acknowledged that "typically the combination of the [CAC Payment] and the consumer's down payment provides the Dealer with a cash profit at the time of sale."

71.     The CAC Score is an important factor in how CAC determines the CAC Payment to offer a dealer. CAC uses the CAC Score to predict the net amount it will collect on the loan ("Predicted Net Collections"). CAC then offers the Dealer a percentage of its Predicted Net Collections.[1]

72.     By providing the Dealer with a percentage of its Predicted Net Collection, CAC's model offers a clear incentive for a Dealer to maximize the total cost of the loan: the bigger the loan, the bigger the payout.

73.     A Dealer can inflate the total cost of a loan, and therefore increase its own earnings, in several ways. It can increase the price of the vehicle, or it can sell "add-on" products with the loan. And because the CAC Software shows the Dealer the CAC Payment it can expect

---

[1] On average, CAC offers Dealers around 72% of its predicted net collections.

to earn on a loan, the Dealer can vary the data inputs in real time to figure out the best way to maximize its CAC Payment.

### CAC's Score-Based Model Guarantees Its Own Profits by Targeting Vulnerable Applicants

74.     CAC's model targets consumers with little to no credit—a uniquely vulnerable population. For example, between November 2015 and April 2021, CAC forecasted an average CAC Score of 64 for borrowers nationwide, meaning that, in the aggregate, CAC projected it would collect 64 cents for each dollar owed on its loan agreements.

75.     The CAC Score is useful to CAC because it helps predict average loan outcomes for borrowers with similar characteristics. Predicting average loan outcomes is a less resource-heavy task than gathering the data necessary to calculate a borrower's actual ability to repay. By using the CAC Score as a shortcut, CAC can more cheaply predict its net collections and scale its payments to Dealers to ensure that CAC makes money from the loans, regardless of whether the borrowers can afford to repay them.

76.     CAC's model ensures a positive profit margin for nearly all its loans, including even those loans made to borrowers with the lowest CAC Scores. Despite predicting that it will not recoup every dollar that it is owed, CAC can still profit on a loan as long as it recoups more than the amount it paid to the Dealer.[2] If CAC's Predicted Net Collections on a loan is accurate, then CAC will collect enough money during the lifespan of the loan to offset the CAC Payment it made to the Dealer.

77.     CAC generally charges consumers in each state the same interest rate, often the maximum interest rate allowed under state law, regardless of their CAC Score. A lower CAC

---

[2] Between November 2015 and April 2021, the average CAC Payment was about 22% less than the amount financed—meaning that CAC needs to collect only about 78% of the amount financed to break even on its CAC Payment to the Dealer.

Score poses a greater credit risk than a higher CAC Score. Rather than accounting for this risk by increasing the interest rate for lower scoring loans, CAC instead incentivizes its Dealers to inflate the principal amount of the loan by increasing the payment to the Dealer for higher loans.

78.    As a result, CAC has about a similar profit margin for lower-scoring (i.e., riskier) loans as it does for higher-scoring loans, despite the fact that borrowers with lower-scoring loans are much more likely to default on the loan.

79.    CAC claims that it caps the degree to which Dealers can inflate the price of their vehicles. Since January 2019, CAC claims to have restricted Dealers from increasing the price of a vehicle beyond 115% of the vehicle's highest Black Book or Blue Book value. But this cap fails to offer any meaningful protection to consumers, because a vehicle's Black Book or Blue Book value is based on a vehicle's best condition and not the vehicle's actual condition, which is likely to be worth much less. Thus, CAC's "cap" does not require Dealers to consider the actual value of a vehicle when setting its price.

**CAC Exercises Control Over Each Aspect of the Financing Process to Protect Its Profits**

80.    CAC exercises control over each material aspect of the vehicle financing process, including the marketing of its loans and the core terms of its loan agreements.

81.    CAC requires its Dealers to use the CAC Software to assess applicants and assign them a CAC Score. The Dealers are required to use the CAC Software to calculate the loan it will offer to an applicant. If the Dealer and the applicant agree to the loan, the Dealer and the applicant then execute the agreement using the terms and documents generated by the CAC Software.

82.    The Dealer inputs various information and data, but the CAC Software ultimately produces the proposed terms for the loan, including the amount financed and the loan's Annual Percentage Rate ("APR").

83.    CAC prohibits Dealers from modifying or adapting the CAC software in any way.

84.    CAC even controls how the loan documents are executed. CAC requires Dealers to use specific, proprietary software ("E-Sign Software") to generate electronic signatures on CAC's documents and agreements.

85.    The E-Sign Software generates two types of electronic signatures: the signer's full name, and the signer's initials. In both types of signature, the signature generated by the E-Sign Software is merely digital text displayed on the document. The E-Sign Software does not capture the signer's actual signature by requiring the signer to draw their signature using the computer's mouse or trackpad.

86.    All that is required to affix a signature to a document using the E-Sign Software is to type the name of the purported signer. There is no way to verify that the person who is allegedly signing a document is the person that is using the E-Sign Software.

**The Bait: CCC Deceptively Advertised Its Vehicles to Get Customers in the Door**

87.    On or about October 16, 2021, CCC posted an advertisement for a 2011 Hyundai Sonata Limited ("the Vehicle") on its Facebook page. The advertisement listed the price of the Vehicle as $10,995.00. The advertisement also said—in all uppercase text—that the Vehicle was "LIMITED TRIM" and "CARFAX CERTIFIED" and had "LOW MONTHLY PAYMENTS!!!"

88.    On or about October 19, 2021, CCC published another advertisement for the Vehicle, this time on the CCC website. This advertisement listed the price of the Vehicle as $10,995.00 and noted that the odometer on the Vehicle was at 63,468 miles.

89.    Neither of these advertisements disclosed the Vehicle's stock number. Nor did they identify the Vehicle as a previously leased vehicle. Nor did they include any mention of a documentary preparation fee.

90.     The 2011 model year Hyundai Sonata was manufactured in three trim levels: GLS, SE, and Limited. Limited trim vehicles—the most expensive of the three—include a sunroof, heated leather seats, and a premium sound system.

91.     Despite being advertised as "Limited Trim," the Vehicle did not have a sunroof, heated leather seats, or a premium sound system. In reality, the Vehicle was the mid-level SE trim, with none of the luxury features of the Limited trim that CCC had advertised.

92.     The Vehicle's CARFAX report—which CCC had access to, according to their own advertisement—even notes that the Vehicle was an SE trim.

93.     Despite being advertised as "CARFAX Certified," the Vehicle was not CARFAX certified, because there is no such thing as CARFAX certification. CARFAX does not certify vehicles.

**The Switch: CCC Misrepresented the Vehicle and Deceived Plaintiff**

94.     After seeing the advertisements for the Vehicle, on or about October 26, 2021, Plaintiff went to CCC's location to test drive the Vehicle and inquire about purchasing it.

95.     After the test drive, Plaintiff put down a $500.00 deposit for the Vehicle consisting of $250.00 in cash and $250.00 by check.

96.     In return for this down payment, CCC gave Plaintiff a document titled "MOTOR VEHICLE CASH PURCHASE AGREEMENT" ("Purchase Agreement"), signed by Gravina-2 on behalf of CCC. The Purchase Agreement identified the Vehicle to be purchased as a 2011 Hyundai Sonata Limited sedan, VIN 5NPEC4AC7BH290675. The Purchase Agreement also documented the $500.00 down payment and specified that an additional payment of $4,600.00 would be due upon delivery of the Vehicle.

97.     The Purchase Agreement was missing essential information. It did not list the Vehicle's sale price, sales tax, inspection fee, Plaintiff's trade-in allowance, the total contract price, the balance due upon trade-in, the amount to be financed, or the total payment.

**The Day of Sale: CCC Presented a Jumble of Deceptive,
Inaccurate, and Non-Compliant Documents to Plaintiff**

98.     On October 30, 2021, Plaintiff paid CCC $4,600.00 by bank check for the second down payment on the Vehicle.

99.     In return for his second down payment, CCC gave Plaintiff a document titled "MOTOR VEHICLE PURCHASE CONTRACT" ("Purchase Contract"), signed by Gravina-2 on behalf of CCC. Plaintiff signed a physical copy of the Purchase Contract in wet ink.

100.    The Purchase Contract was missing essential information. For instance, it did not identify the Vehicle's trim level, nor did it identify the Vehicle as a previously leased car. It did not list the Vehicle's sale price, sales tax, registration fee, title fee, inspection fee, documentary preparation fee, Plaintiff's trade-in allowance, the total contract price, the balance due upon trade-in, the amount to be financed, or the total payment. The Purchase Contract did not specify the respective amounts or prices for any of the terms of the Vehicle's sale.

101.    In fact, the Purchase Contract did not identify any consideration for the Vehicle whatsoever.

102.    The Purchase Contract stated that "[the Vehicle] carries an express warranty" and that Plaintiff would "receive the written warranty at time of delivery." But CCC never gave Plaintiff any warranty documentation for the Vehicle at the time of delivery, or anytime thereafter.

103.    The Purchase Contract explicitly stated that it "comprise[d] the entire agreement."

17

104.    On October 30, 2021, Plaintiff and CCC also executed a Bill of Sale for the Vehicle. The Bill of Sale was signed by Gravina-2 on behalf of CCC. Plaintiff signed a physical copy of the Bill of Sale in wet ink.

105.    The Bill of Sale also did not identify the Vehicle's trim level, nor did it identify the Vehicle as a previously leased car.

106.    The Bill of Sale listed the sale price, the trade-in allowance, the warranty fee, and the balance due on trade-in. The Bill of Sale also listed a combined figure representing the sum of the sales tax amount, the registration fee, the title fee, the inspection fee, and the documentary preparation fee, but did not include the itemized amount for each of these figures.

107.    The Bill of Sale did not list the value of the two down payments, the amount to be financed, or the amount due on delivery, each of which were essential terms of the agreement between Plaintiff and CCC.

108.    CCC also miscalculated key figures in the Bill of Sale. The line items listed in the "Costs and Discounts" section of the Bill of Sale sum to $20,989.63. But the "Total" amount the CCC put under that section was $12,789.63—a difference of $8,200.00.

**CCC Participated in CAC's Predatory and Deceptive Scheme**

109.    CCC is one of the many Dealers that partners with CAC to offer CAC's loans to consumers and directly advertises CAC's financing program to its customers. Indeed, CCC has CAC's promise of "GUARANTEED FINANCING" permanently emblazoned on the front of its building.

110.    CCC's employees received training, through CAC's "University" training program, on how to best market CAC's products and services. Through this training program, CAC trained CCC and its staff to take advantage of consumers with little to no credit by making

18

promises of "financial freedom" and falsely representing that CAC would be their only option to secure financing.

111.    Like other CAC-approved Dealers, CCC uses the CAC Software to generate loans for applicants and receives a percentage cut of CAC's predicted collections on a loan. And like other CAC-approved Dealers, CCC has a direct incentive to inflate the size of an applicant's loan to maximize its own profit.

**CCC Misled Plaintiff to Believe That He Was Required to Purchase Add-On Products**

112.    CAC allows its dealers to sell two pre-approved add-on products with its loans: a vehicle service contract ("VSC") that functions as a promise to repair or replace certain vehicle parts, and a guaranteed asset protection ("GAP") that ostensibly covers the amount a borrower would owe after an insurance pay-out in the event that their vehicle is stolen or totaled.

113.    The retail price for each product is included in the principal of the loan, so borrowers pay interest on the add-ons for the full duration of the loan. Because the add-ons cost hundreds or even thousands of dollars, purchasing an add-on has a significant impact on the overall cost of a loan and increases the borrower's monthly payments.

114.    CAC created and controls the process for selling add-on products. CAC initially determines whether a borrower is eligible to purchase an add-on and informs dealers of a borrower's eligibility. CAC selects the third-party administrator, such as WEC, for the add-on and controls the price that borrowers pay for the add-on. CAC also drafts the contract template that will govern the add-on agreement between the borrower and the third-party administrator, and then populates the contract template with information specific to the borrower prior to execution of the agreement.

115.    Add-on products are extremely profitable for CAC. In 2020 alone, CAC received approximately $250 million from add-on products nationwide. Approximately $200 million of

this came from fees paid by borrowers, while the other $50 million came from fees paid by third-party administrators.

116.    Because add-ons are so profitable to them, CAC trains Dealers on how to upsell add-ons to borrowers. CAC teaches Dealers how to explain the add-ons to borrowers and how to respond to borrowers' questions about the add-ons. The Dealers themselves also profit from selling add-ons: CAC pays Dealers a flat commission for the sale of an add-on.

117.    CAC tracks how many add-ons a Dealer sells. A Dealer can improve its rating, and therefore increase the total CAC Payment it will receive, by selling more add-ons. Indeed, between November 2015 and April 2021, nearly 90% of CAC loan agreements included at least one add-on.

118.    When CCC used the CAC Software to calculate the loan it would offer to Plaintiff, the CAC Software showed CCC what its potential CAC Payment would be if Plaintiff were to purchase any add-ons.

119.    After seeing its potential earnout, CCC told Plaintiff that he was required to purchase a Vehicle Service Contract ("VSC") from WEC in order to be eligible for a loan from CAC.

120.    This was not true. While they may be profitable for CCC and CAC, purchasing an add-on is not a requirement or a condition of a CAC loan.

121.    Unaware that CCC was lying to him, Plaintiff agreed to the inclusion of the VSC at an additional cost. Had he known that CCC was misrepresenting the VSC, Plaintiff would not have agreed.

### CCC Used E-Signature Software to Fraudulently Sign Plaintiff's Name

122.    Like other CAC-approved Dealers, CCC uses the E-Sign Software to execute all the loan documents.

123.    On October 30, 2021, while at the CCC Facility, Plaintiff signed a physical copy of CAC's "Declaration Acknowledging Electronic Signature Process" ("E-Sign Declaration") in wet ink. Gravina-2 signed on behalf of CCC. Plaintiff never received a copy of the executed E-Sign Declaration.

124.    The E-Sign Declaration contained blatant misrepresentations.

125.    The E-Sign Declaration falsely stated that Plaintiff had "read, understood, and agreed to the eSign Consent form and consented to use electronic signatures to sign all documents necessary to process a retail installment contract…." Neither CCC nor CAC provided Plaintiff with the "eSign Consent form" despite it being referenced in the E-Sign Declaration.

126.    The E-Sign Declaration also falsely stated that Plaintiff "was in physical control of the key board, mouse or other device to click a button, signature box, or initial box that applied [his] e-signature to the documents with the intent to sign the documents as if [he] provided [his] handwritten signature on the documents."

127.    This was not true. Plaintiff did not use the computer to affix his e-signature to the document. Rather, Gravina-2 placed Plaintiff's e-signature on all of the relevant documents before seeking Plaintiff 's consent to use the E-Sign Software.

128.    Gravina-2 had, without receiving any consent from Plaintiff, affixed Plaintiff's signature on three documents: the Retail Installment Contract ("Electronic RIC"), the Credit Acceptance Corporation Disclosure Form ("CAC Disclosure"), and the Wynn's Plus+ Vehicle Service Contract/Application ("VSC") (collectively, the "Electronic Transaction Documents").

129.    In total, the Electronic Transaction Documents contain over 29,000 words. Reading at an average speed,[3] it would take a person over two hours to read through the entirety of the documents.

130.    Gravina-2 did not give Plaintiff any time or opportunity to review the CAC Disclosure or the VSC prior to affixing Plaintiff's electronic signature to them. The only document that Plaintiff received in advance was a paper copy of a Retail Installment Contract, but Gravina-2 did not give Plaintiff any time or opportunity to compare the paper copy to the electronic version.

131.    The CAC Disclosure also deceptively states that Plaintiff "[is] considering entering into" a Retail Installment Contract with CCC. The timestamps on Plaintiff's electronic signatures belie this statement: the Electronic RIC was signed at 2:55:25, and the CAC Disclosure was signed eleven seconds later, at 2:55:36.

132.    Because the Electronic RIC was executed before the CAC Disclosure, the CAC Disclosure falsely represented that the Retail Installment Contract was merely under consideration.

133.    The title of the CAC Disclosure is inherently misleading. The CAC Disclosure is not some passive document that informs the reader of various information. Rather, it contains a merger clause that states that the Retail Installment Contract contains the *entire* agreement between the parties—a clause that actively purports to modify the agreement, not merely "disclose."

134.    Critically, this merger clause was absent from the Electronic RIC, which was executed before the CAC Disclosure. Thus, after purportedly binding Plaintiff to the Electronic

---

[3] A 2019 study published in *Journal of Memory and Language* estimated that the average silent reading rate for adults reading non-fiction in English is 238 words per minute. https://doi.org/10.1016/j/jml.2019.104047.

RIC, CCC and CAC attempted to unilaterally import a material contractual provision through a deceptively titled document.

135.    This sequence—finalizing the principal contract before presenting a document that misrepresents the transaction's status and its own contents, and seeks to add essential terms—was a deliberate and unfair practice. It was designed to prevent Plaintiff from comprehending the full and final terms of the agreement before being bound by it.

**CAC and CCC Are Defined as a Collective Entity in the Electronic RIC**

136.    The Electronic RIC expressly defines the terms "Us" and "We" to "mean Creditor-Seller [the dealer] and Creditor-Seller's assignee," the latter of which is separately defined as CAC.

137.    Though CAC is defined as the "Creditor-Seller's assignee" on the Electronic RIC, the actual assignment does not take place immediately. Per the terms of the Electronic RIC, the assignment occurs "pursuant to and in accordance with the terms and conditions set forth in the existing dealer agreement between Seller and Assignee."

138.    As described in CAC's own public filings and, on information and belief, under CAC's agreement with CCC, an assignment is not legally effective until such time as (i) CAC receives and approves the related contract files and (ii) delivers the CAC Payment for the loan.

139.    Although CAC is defined as the Creditor-Seller's assignee on the Electronic RIC, the Buyer's contractual obligations to CAC are immediate. In particular, the Electronic RIC states that the Buyer has "agreed to buy the Vehicle from Us on credit"—meaning from CAC and the dealer—and that the Buyer "promise[s] to pay Us all amounts due" under the Electronic RIC. All other terms and conditions of the loan agreements likewise flow to "Us" and "We"— meaning CAC and the dealer—rather than to a single party.

140. The provisions of CAC's Electronic RIC are unlike those used by typical auto finance companies, which typically either (i) name only the dealer as the party to the loan agreement at the outset or (ii) include reference to the party being assigned the contract, but make clear that the assignee's rights are effective only after assignment.

141. The Massachusetts version of the LAW® 553® Retail Installment Sale Contract, the most widely used automotive retail installment contract template in the United States, names only the dealer as the party to the loan agreement at the outset.

142. CAC's model is uniquely structured to blur the lines between dealer and lender at the point of sale.

**Plaintiff's Loan Contained a Deceptive, Hidden Finance Charge**

143. CAC's model is also unique among its peers in that it does not vary its interest rate based on future performance of the loan and that it offers loans to nearly all consumers, regardless of their creditworthiness or reasonable ability to repay. It is unique because it is risky. And instead of varying its interest rate to account for this risk, CAC and its Dealers inflate the principal amount of the loan.

144. This results in CAC's loans being more expensive than those of its peers. Inflating the principal amount of the loan is designed to insulate CAC from risk, but CAC deceptively discloses it to borrowers as just principal.

145. Despite CAC's claims that it caps the degree to which Dealers can inflate the price of vehicles, inflating the price of vehicles is baked into CAC's business model.

146. The difference between the total disclosed cost of the transaction to the borrower (minus interest) and the Dealer Compensation operates in effect as interest. CAC uses this difference to protect itself from the risk posed by borrowers with low-scoring loans. Because an all-cash purchaser would not pay this amount, it is a finance charge. But CAC hides this finance

charge from its low-scoring borrowers, instead disguising it as part of the principal. Even worse, because CAC bakes this hidden finance charge into the principal, borrowers then must pay interest on it.

147.    This hidden finance charge in CAC transactions varies depending on the creditworthiness of the borrower. Borrowers with lower-scoring loans, like Plaintiff, tend to pay more for a vehicle, relative to the vehicle's value, than borrowers with higher-scoring loans. Despite this variation, CAC misrepresents that it offers the same, or very similar, interest rates across borrowers. In reality, the true cost of CAC credit when recalculated to include these hidden finance charges, varies in the same way that other lenders' interests rates vary to account for borrower creditworthiness.

148.    Plaintiff is one of these low-scoring borrowers whom CAC deceptively saddled with a hidden finance charge.

149.    CCC obtained personal information about Plaintiff to enter into the CAC Software. At this stage, behind the scenes, CAC offered CCC predictions about its expected CAC Payment if it were to sell Plaintiff particular vehicles at particular prices. Once CCC selected the Vehicle in the CAC Software, CCC could then manipulate other inputs to change the size of its expected CAC Payment, including the down payment on the Vehicle, the length of the loan term, the Vehicle's sale price, and the purchase of any add-on products.

150.    CCC, like other CAC-approved Dealers, had a strong incentive to inflate the price of Plaintiff's loan. CCC took full advantage of its opportunity, including by deceiving Plaintiff into purchasing the optional VSC.

151.    Once CCC finalized the various data inputs, the CAC Software produced the proposed terms for Plaintiff's loan, including the principal amount of the loan and the loan's

APR. These terms did not disclose the hidden finance charge that Plaintiff would be paying. Instead, it was deceptively presented to Plaintiff as part of the principal amount of his loan—an amount that he would be paying interest on.

152.    Collectively, CAC and CCC misrepresented the true cost of Plaintiff's transaction by hiding additional charges within the principal and inflating the total amount financed. By hiding the true amount financed, they deprived Plaintiff, and other borrowers like him, of the ability to make informed decisions, to compare financing options, and to avoid paying unconscionably high interest charges. And because CAC charges interest on the full amount financed—which includes the hidden finance charge—CAC saddled Plaintiff, and other borrowers like him, with exceptionally high monthly payments, thereby increasing the risk of default and repossession.

**CAC Unilaterally Changed the Terms of Plaintiff's Loan Without His Consent**

153.    Sometime after his loan was finalized, Plaintiff received a letter dated October 31, 2021, from CAC that informed him that the VSC, despite what CCC and Gravina-2 told him, was optional and that Plaintiff had not been required to purchase it as a condition of his loan. This letter also informed Plaintiff that he had the option to cancel the VSC and that, if he cancelled it, CAC would reduce the total amount that Plaintiff had to pay on his loan by $2,760.00 and his monthly payment would be reduced to $299.92 accordingly.

154.    Once Plaintiff learned that the VSC was optional, he called CAC to cancel the VSC. During this conversation, he complained to CAC of CCC's deception.

155.    On or about November 20, 2021, Plaintiff received a letter from CAC confirming that the VSC had been cancelled and that he would receive a refund for the full purchase price of the VSC. Specifically, the total amount that Plaintiff would have to pay on his loan would be reduced by $1,586.00, and his monthly payment would be reduced to $299.92 accordingly.

156.    The cancellation letter also informed Plaintiff that his retail installment contract—the agreement governing the loan—was originated as a pre-computed account. To change the payment amount to account for the refund of the VSC, CAC would have to convert his account to an interest-bearing account, which would accrue daily interest on the unpaid balance of the loan.

157.    Plaintiff did not receive any prior notice that his pre-computed account would be converted to an interest-bearing account, nor did he ever consent to this conversion.

158.    The conversion of Plaintiff's pre-computed account to an interest-bearing account was not, as CAC claimed, "necessary to change the payment amount" to reflect the VSC refund. The standard practice in such a scenario is to re-amortize the existing pre-computed contract by applying the refund to the principal balance and recalculating the monthly payments over the remaining term at the original interest rate.

159.    When CAC converted Plaintiff's account, it unilaterally and fundamentally altered the terms of the loan agreement to Plaintiff's detriment. In a pre-computed loan, the total interest charge is fixed from the outset; even if Plaintiff were to make payments slower than anticipated, his total interest charge would remain the same. In an interest-bearing loan, Plaintiff's total interest charge would increase if he were to make payments slower than anticipated. By converting his account, CAC shifted the risk of increased interest to Plaintiff.

160.    By unilaterally converting Plaintiff's account in this manner, CAC denied Plaintiff the benefit of his original bargain and burdened him with a potentially more expensive loan.

161.    This was not an isolated mistake on CAC's part. Rather, it is part of a pattern and practice of unfair and deceptive conduct by CAC: between January 2017 and August 2020, CAC

received more than 1,000 consumer complaints related to its add-on products, including complaints that dealers were requiring borrowers to purchase add-ons as a requirement to obtain a CAC loan.

162.    CAC knew or recklessly disregarded the fact that its dealers, including CCC, were misleading borrowers into thinking that the add-ons were a mandatory part of a CAC loan. Despite the control that CAC exercises over both its Dealers and the purchase process for add-ons, CAC has done little to remedy its Dealers' misrepresentations.

163.    CAC continues to allow its Dealers, including CCC, to use e-signatures for almost all loan documents, including the disclosures regarding the add-ons.[4] But many borrowers never get a meaningful chance to review these documents prior to signing them. In fact, between January 2017 and August 2020, CAC received over 1,700 complaints from consumers about the e-signature process, 1,100 of which specifically complained that the Dealer refused to allow the borrower to control the mouse while executing the documents.

164.    After the loan documents are executed via e-signature, Dealers, including CCC, are supposed to print a copy for the borrower. But from October 2018 to March 2019, CAC received over 800 complaints from borrowers who did not receive a printed copy of their loan agreement from the dealer. Indeed, Plaintiff never received a printed copy of the executed loan agreement from CCC. Nor did he receive a printed copy of the executed VSC—the first time he received a copy of the VSC was *after* he contacted CAC to cancel it.

---

[4] In 2019, for example, more than 96% of CAC loan agreements were executed using e-signatures.

165.    Despite this clear pattern, CAC has failed to effectively penalize or reprimand its Dealers for misleading borrowers and falsely stating that they were required to purchase add-ons as a condition of their loan agreement.[5]

**CAC and CCC's Loan Documents Failed to Comply with State and Federal Law**

166.    CAC, through the CAC Software, determined the form and substance of the financial disclosures provided to Plaintiff in its loan agreement. CAC designed the loan agreement, including the required disclosures, and made them available to CCC.

167.    CAC's role in creating the underlying loan agreement is prominently displayed on the face of the document: CAC loan agreements typically contain a reference to a CAC model form identifier and a CAC copyright stamp.

168.    CAC has assumed responsibility for ensuring that its loan agreements comply with state and federal disclosure requirements. CAC maintains a Compliance Committee that is concerned with CAC's compliance with various laws and regulations, including state disclosure regimes. And CAC's policy states that it will not acquire or purchase interests in loan agreements that are not in compliance with federal disclosure requirements.

169.    Federal and state law impose a variety of disclosure requirements on creditors to ensure that potential borrowers receive accurate and complete disclosures on the face of a Retail Installment Contract ("RIC"). They require that a RIC disclose the APR, the finance charge, the amount financed, the total of payments, the total sale price, and the payment schedule.

170.    Plaintiff's Electronic RIC did not contain all of the required disclosures. Because CCC artificially inflated the principal of Plaintiff's loan to account for the risk posed by the loan,

---

[5] From 2017 to 2020, CAC did not impose a single financial penalty on any dealer for falsely stating that add-ons were required.

it should have disclosed that difference in value as finance charge on the RIC. Instead, this figure was disguised within the total amount financed.

171.    Further, because the APR disclosed on the RIC is calculated based on the disclosed finance charges and amount financed, it substantially understates the actual APR. Were the hidden finance charges removed from the disclosed amount financed and properly incorporated into the total finance charges, the APR based on this figure would routinely exceed 21% and, in some cases, would exceed 100%.

172.    In Massachusetts, the maximum interest rate that may be charged is 21%. CAC loan agreements in Massachusetts consistently impose an APR that is close to, but never in excess of, 21%—specifically, 20.99%. But because CAC conceals its true cost of credit by imposing a hidden finance charge on borrowers, the true cost of a CAC loan is higher than cost that would be incurred subject to the maximum interest rate in Massachusetts.

173.    CAC repeatedly sent Plaintiff information about his loan, *via* physical and electronic mail.

174.    On at least 21 occasions between November 16, 2021, and July 16, 2025, CAC sent Plaintiff a "PAYMENT DUE NOTICE" via United States Postal Service ("USPS") first-class mail.

175.    On at least 16 occasions between December 16, 2021, and May 16, 2023, CAC sent Plaintiff an e-mail with the subject line "Important: Your Payment Due Notice is now available," the body of which instructed him to log into CAC's Customer Portal to view his payment notice.

176.    On at least 19 occasions between December 27, 2021, and July 11, 2023, CAC sent Plaintiff an e-mail with the subject line "Credit Acceptance AutoPay" which informed him that an "automatic payment of $299.92" would be withdrawn from his bank account.

177.    On November 18, 2022, May 16, 2024, and July 16, 2024, CAC sent Plaintiff a document titled "RIGHTS OF DEFAULTING BUYER UNDER THE MASSACHUSETTS MOTOR VEHICLE INSTALLMENT SALES ACT" ("RDB Notice") by USPS first-class mail. The RDB Notices informed Plaintiff that the "Original Date of Contract" for his loan was October 30, 2021, and that the "Original Amount of Contract" was $11,203.63.

178.    On August 1, 2022, CAC sent Plaintiff a letter by USPS first-class mail informing him that his payment of $594.84 was more than 30 days past due.

**Plaintiff's Loan is Usurious**

179.    CAC and CCC concealed the true cost of Plaintiff's loan by misclassifying substantial finance charges as principal, thereby understating the finance charge and overstating the amount financed.

180.    The Electronic RIC executed by CCC disclosed an "amount financed" of $12,789.63 and a "finance charge" of $7,966.17. Those figures were materially inaccurate because they excluded multiple costs that were imposed on Plaintiff as a condition of obtaining CAC financing and therefore constituted "finance charges" under both federal and state law.

181.    *First,* CCC falsely represented that the Wynn's Vehicle Service Contract ("VSC") was mandatory in order to secure CAC financing. The $1,586.00 price of the VSC was added to the principal balance of the loan even though the product was optional and conferred no independent value to Plaintiff.

182.    *Second,* CCC and CAC inflated the cash price of the vehicle by at least $2,000.00 above the advertised amount, embedding this overcharge in the principal of the loan. Because

Plaintiff would not have paid that amount in a cash transaction, the inflated portion of the sale price functioned as an additional finance charge.

183.    *Third,* CCC and Gravina-2 falsified the down payment amount in the Electronic RIC. Although Plaintiff paid CCC a total of $5,100.00 in down payments ($500.00 on October 26, 2021 and $4,600.00 on October 30, 2021), the Electronic RIC reported only $3,000.00 as "Cash Down Payment." The remaining $2,100.00 of Plaintiff's funds was never applied to the transaction. Gravina-2, acting on behalf of CCC, converted or misappropriated these funds for his or CCC's benefit. The uncredited portion of Plaintiff's down payment further increased the total cost of credit charged to Plaintiff.

184.    When these hidden and misclassified charges totaling $5,686.00 are properly accounted for, the effective finance charge on Plaintiff's loan increases to $13,652.17, while the true amount financed falls to $7,103.63. By disguising these sums as principal rather than as finance charges, CAC and CCC caused the disclosures on the Electronic RIC to materially understate the Annual Percentage Rate and misrepresent the true cost of credit to Plaintiff.

185.    When the hidden and misclassified finance charges—including the fraudulently induced VSC, the inflated vehicle price, and the uncredited down payment—are properly accounted for, the true cost of Plaintiff's credit is revealed. The loan's essential financial components are recalculated as follows: a true "Amount Financed" of $7,103.63 (the real value received) and a true "Finance Charge" of $13,652.17 (the real cost of credit). Using the standard actuarial method mandated by TILA, these figures result in an effective Annual Percentage Rate (APR) of at least 54.34%.

186.    This effective APR of at least 54.34% is more than double the 21% maximum interest rate permitted for motor vehicle installment sales in Massachusetts. It is also drastically

higher than the deceptively low 20.99% APR disclosed in the Electronic RIC, which was calculated by wrongfully burying substantial finance charges within the loan's principal amount. This deliberate miscalculation and concealment render Plaintiff's loan usurious under Massachusetts law.

### Predatory Financing Aside, Plaintiff's Vehicle Was Seriously Defective

187.    Plaintiff's Vehicle, the 2011 Hyundai Sonata that he purchased from CCC with financing from CAC, was a ticking time bomb.

188.    The Vehicle contained a 2.4-liter Theta II engine, manufactured by HMMA at its manufacturing facility in Montgomery, Alabama, and was designed in part by HATC.

189.    The 2011 Hyundai Sonata model with the 2.4-liter Theta II engine ("the 2011 Sonata") are widely known to contain two serious and dangerous defects.

190.    The 2011 Sonata was designed and manufactured with defective connecting rod bearings, materials and components. When the defective connecting rod bearings begin to fail, they fracture and shed metal debris into the engine oil. At a certain point, the oil becomes so contaminated with debris that the oil filter can no longer effectively remove the debris. This results in the debris being transported around the engine via the contaminated oil, damaging various engine components along the way. This defect inevitably results in catastrophic engine failure.

191.    The 2011 Sonata also has insufficient lubrication channels. Engines are designed to have oil distributed throughout the engine via lubrication channels. When operating properly, engine oil is distributed throughout the engine via the oil pump, and then flows back to the oil pan, where it is then redistributed throughout the engine. The lubrication channels in the 2.4-liter Theta II engine clog under normal use and proper maintenance. When the lubrication channels clog, engine oil is unable to be both pumped throughout the engine (through the oil pump) and is

also unable to adequately return to the oil pan, causing a condition known as oil starvation. This results in insufficient lubrication throughout the engine, which causes premature wear of the engine components and ends in catastrophic engine failure.

192.    These defects pose a serious safety risk to consumers. The failure of the connecting rod bearings can cause complete engine failure while the vehicle is in operation, suddenly and without warning. The insufficient lubrication channels exacerbate the risk posed by the defective connecting rod bearings and accelerates the engine's complete failure. This failure can occur at any time, at any speed, under any conditions, thereby exposing the vehicle's driver and occupants to an increased risk of injury or death.

193.    HMA is acutely aware of the safety issues inherent to the 2011 Sonata. They have caused numerous incidents and have been the subject of countless safety complaints and several high-profile recalls and lawsuits.

194.    HMC and HMA entered into a settlement agreement to resolve a class action lawsuit involving the 2011 Sonata. This settlement imposed a variety of obligations on HMC and HMA, but clearly disclaimed that "[a]ll rights otherwise available to owners and lessees under preexisting warranties will continue to remain available to Class members notwithstanding the implementation of [the] Settlement" and that "[n]othing in [the] Settlement will be construed as diminishing or otherwise affecting any express or implied warranty, duty, or contractual obligation of HMA [ . . . ] in connection with [the 2011 Sonata]."

**HMA's Warranty Obligations and the Authorized Dealer Relationship**

195.    As HMC's U.S. sales and marketing division, HMA is responsible for the sales, marketing, service, distribution, import and export of Hyundai-branded products, including vehicles and parts, in the United States.

196.    HMA is also the warrantor of Hyundai vehicles, including Plaintiff's Vehicle, throughout the United States.

197.    To sell vehicles to the public, HMA enters into agreements with authorized dealerships, including BHCC and BMSC, which sell vehicles to consumers. In addition to the exclusive right to sell new Hyundai-branded vehicles, BHCC and BMSC are also permitted to service and repair Hyundai-branded vehicles under the warranties HMA provides to consumers. HMA instructs these dealers, including BHCC and BMSC, to complete all service and repair according to HMA's instructions, issued through service manuals, service bulletins, and other documents.

198.    Per the agreement(s) between HMA and BHCC and BMSC, consumers like Plaintiff are able to receive services under HMA's issued warranty at dealer locations that are convenient to the consumers. These agreements provide HMA with a significant amount of control over the authorized dealerships. For example, employees of HMA are appointed as managers for particular regions of the United States and their responsibilities include managing the day-to-day operations of the dealerships located within their regions.[6]

199.    HMA extended the warranty for vehicles containing the 2.4-liter Theta II engine, including the 2011 Sonata.[7] On or about April 15, 2022, it communicated this warranty extension to its affiliated dealers and to NHTSA through an updated "Dealer Best Practice" ("DBP") guidance.

---

[6] *See, e.g.,* https://www.hyundainews.com/en-us/releases/2135 ("Hyundai Motor America named Kimberly Walker General Manager of the Western Region, effective March 1, 2016. In her new role, Walker will lead the day-to-day operations of more than 165 Hyundai dealerships across the 12 Western-most states in the United States.").

[7] Other Hyundai-branded vehicles were manufactured with this engine; the extended warranty applied to some of those vehicles as well.

200.    In the DBP, HMA informed dealers that certain vehicles containing the defective engines may require the engine to be inspected and possibly replaced. The DBP also outlined the Extended Warranties ("Extension TXXC" and "Extension TXXI"). Specifically, HMA removed the "Service Campaign 953" KSDS software update requirement, which had required certain classes of the defective vehicles to install a knock sensor detection system ("KSDS") software update in order to maintain warranty eligibility.

201.    The DBP instructed dealers to ensure that their entire team complete the "Engine Support" training course on the Hyundai Learning Portal, and included the following graphic to illustrate that Extension TXXI was an extension of the original powertrain warranty:



**Plaintiff Properly Maintained the Vehicle**

202.    The owner's manual supplied with the Vehicle ("Owner's Manual") instructs owners of Sonata vehicles equipped with 2.4-liter Theta II engines to replace the engine oil and filter every 7,500 miles. So, Plaintiff did exactly that.

203.    On or about April 16, 2022, with approximately 68,925 miles displayed on the Vehicle's odometer, Plaintiff had the Vehicle's engine oil and filter changed at Valvoline Instant Oil Change ("VIOC") in Falmouth, Massachusetts using Valvoline High Mileage with MaxLife Technology synthetic blend motor oil ("MaxLife").

36

204. On or about August 27, 2022, with approximately 75,114 miles displayed on the Vehicle's odometer, Plaintiff had the Vehicle's engine oil and filter changed at VIOC using MaxLife.

205. On or about December 22, 2022, with approximately 82,433 miles displayed on the Vehicle's odometer, Plaintiff had the Vehicle's engine oil and filter changed at VIOC using MaxLife.

206. MaxLife includes "seal conditioners to reduce oil consumption and oil leaks in high mileage engines" and added detergents to "reduce sludge, corrosion, rust and deposits to help keep motors clean inside and ensure a smooth-running engine." MaxLife is classified as ILSAC GF-6A, which exceeds the minimum standard, ILSAC GF-4, specified in the Owner's Manual.

207. Plaintiff consistently performed all maintenance and operations which were necessary to maintain the Vehicle's intended function.

**Despite His Efforts, Plaintiff's Vehicle Failed Catastrophically Due to Its Inherent Defects**

208. On or about March 21, 2023, Plaintiff was driving the Vehicle on the highway at approximately 60 miles per hour, when he heard a loud noise suddenly emanate from the engine. Immediately, while surrounded by fast-moving traffic, the Vehicle stopped accelerating and the power steering failed. With no ability to accelerate or adequately steer the Vehicle, Plaintiff was forced to change lanes suddenly and unexpectedly in order to reach the breakdown lane, nearly colliding with a semi-truck in the process.

209. This was an extremely distressing experience for Plaintiff and he feared for his safety as other cars sped past him.

210.    Plaintiff had the Vehicle towed from where it broke down to M&N Auto Repair ("MNAR"), an independent auto repair shop in Falmouth, Massachusetts, for inspection and diagnosis.

211.    MNAR informed Plaintiff that the Vehicle's engine had seized due to connecting rod bearing failure and that the crankshaft would not rotate. MNAR also informed Plaintiff generally of the history regarding the defective Theta II engines and advised Plaintiff that HMA had covered them with a lifetime warranty. MNAR recommended that, prior to commencing further work on the Vehicle, Plaintiff should contact a local Hyundai dealer, such as BHCC, to inquire about warranty coverage.

212.    On or about March 23, 2023 Plaintiff called BHCC. Plaintiff spoke with an employee of BHCC. Plaintiff informed the employee that the Vehicle was exhibiting a no crank/no start condition related to connecting rod bearing damage. Plaintiff provided the employee with the Vehicle's VIN.

213.    After searching the Vehicle's VIN, the employee told Plaintiff that the Vehicle's engine was ineligible for replacement under HMA's lifetime warranty because it did not have the required software update issued under Service Campaign 953—the software update that HMA removed as a warranty requirement, as announced in the DBP.

214.    The employee told Plaintiff he could bring the Vehicle to BHCC and pay a diagnostic fee to confirm the cause of the engine failure.

215.    The Vehicle's Warranty Book states: "After consulting with your dealership, if you feel additional clarification or help is needed, write or call [HMA's] National Consumer Assistance Center." So, Plaintiff sent a demand letter ("HMA Demand-1") to HMA. In this letter, Plaintiff informed HMA that his Vehicle's engine failed while he was driving on the

highway, due to the known defect, and that HMA has acknowledged this defect by providing a lifetime warranty for its Theta II Engines. Plaintiff further informed HMA that BHCC told him that his warranty claim would not be approved, because his vehicle did not have the required software update under Service Campaign 953.

216.    In the HMA Demand-1, Plaintiff requested that HMA repair or replace the defective Theta II engine in his Vehicle, perform all of the necessary recall updates and repairs, and reimburse him for the expenses he incurred trying to resolve the issue.

217.    HMA did not respond to HMA Demand-1. In doing so, HMA denied Plaintiff the benefit of his Vehicle's extended warranty.

218.    Because HMA failed to repair the Vehicle under its warranty, Plaintiff was forced to cancel the Vehicle's registration on or about March 30, 2023. Unable to drive, Plaintiff resorted to using Uber and renting cars to get around.

219.    In total, Plaintiff incurred over $20,000 in vehicle rental expenses as a result of the Vehicle's failure.

**BHCC and HMA Replaced Plaintiff's Defective Engine with Another Defective Engine**

220.    On or about March 6, 2024, at or about 9:14 AM, Plaintiff called BHCC at 508-778-0500 to make a service appointment for the following day. BHCC sent a text message to Plaintiff at 9:21 AM confirming the appointment.

221.    On or about March 7, 2024, at or about 9:24 AM, Plaintiff again called BHCC at 508-778-0500 to confirm that he had arranged to have the Vehicle towed to BHCC's location that day. A few hours later, Plaintiff had the Vehicle towed from MNAR to BHCC's location.

222.    It took BHCC five days to open a repair order for the Vehicle.

223.    On or about March 19, 2024, at or about 9:23 AM, Plaintiff called BHCC again for an update on the Vehicle. BHCC informed Plaintiff that HMA had approved his warranty

claim and the Vehicle's engine would be replaced by BHCC at HMA's expense. BHCC also informed Plaintiff that it was experiencing delays with engine replacements related to the volume of claims, supply chain issues, and the availability of courtesy rental vehicles.

224.    BHCC offered Plaintiff a courtesy rental vehicle ("Courtesy Rental") at no cost to him until BHCC could complete the engine replacement. On or about March 20, 2024, Plaintiff executed a rental agreement with BHCC and took possession of the Courtesy Rental.

225.    On information and belief, BHCC intentionally misled Plaintiff and other owners of Theta II Vehicles into believing their vehicles were not covered under warranty, when in fact their vehicles were, because BHCC knew that it did not have the resources to deal with the sheer number of defective vehicles within its customer base/market area.

226.    BHCC also informed Plaintiff that HMA would reimburse him up to $40.00 per day for rental expenses incurred prior to HMA approving his warranty claim.

227.    BHCC replaced the Vehicle's engine using a remanufactured 2.4-liter Theta II engine produced and supplied by HMMA, updated the Vehicle's software, and replaced its battery.

228.    Plaintiff had the Vehicle towed back to MNAR for additional maintenance. MNAR replaced the front and rear brake pads and brake rotors, flushed and replaced the brake fluid. Plaintiff also had a set of tires installed and a wheel alignment performed at Used Tire Warehouse Inc. in Wareham, MA.

229.    Anticipating having a functioning Vehicle once again, Plaintiff purchased a new insurance policy for the Vehicle and obtained a new registration from the Registry of Motor Vehicles. Due to the lapse in auto insurance coverage caused by HMA and BHCC's failure to

approve his warranty claim for over a year, Plaintiff paid a substantial surcharge on the new insurance policy.

230.    Unfortunately, BHCC's engine replacement did not remedy the defect. HMA and BHCC merely installed a remanufactured Theta II engine with the exact same defect that caused Plaintiff's car to fail in the first place. Because the defect inherent to the Theta II engine inevitably causes engine failure, this "remedy" has once again put Plaintiff and other drivers at risk.

231.    On or about September 24, 2024, Plaintiff sent another demand letter ("HMA Demand-2") to HMA through its electronic case management portal. Shortly thereafter, Plaintiff received an automated email confirming receipt of his submission and assigning it case number 23931102.

232.    On or about September 26, 2024, HMA sent Plaintiff an email stating that HMA was unable to contact him by phone. Plaintiff has no record of HMA's alleged phone call(s) to him.

233.    On or about October 1, 2024, Plaintiff emailed HMA to request that HMA respond to HMA Demand-2 in writing.

234.    HMA took nearly four months to respond. On or about January 29, 2025, Plaintiff received two emails purportedly from the "Hyundai Class Action Settlement Center". The first email stated that the sender had "received these documents," with no explanation as to which documents it was referring to, and that it had "submitted [Plaintiff's] claim on [their] website." The second email stated that for Plaintiff's reimbursement claim to be considered, he would have to submit copies of the qualifying repair order and proof of payment for the rental invoices.

235.    However, Plaintiff was not eligible for reimbursement under the Class Action Settlement, because he purchased the Vehicle after the claims deadline. Plaintiff nevertheless submitted a claim form and copies of expense receipts to ensure that he had exhausted all possible remedies.

### CAC Has Unlawfully Retained a Security Interest in the Vehicle and Continued to Cause Plaintiff Harm

236.    By mid-October 2024, Plaintiff had paid to CAC a total of $14,457.52 in connection with the loan for the Vehicle, consisting of a $5,100.00 cash down payment and $9,357.52 in installment payments.

237.    On or about October 17, 2024, Plaintiff sent a demand letter to CAC, requesting, in part, that CAC refund all interest and fees paid and cause any related lien to be released and to immediately surrender the Massachusetts certificate of title.

238.    CAC did not execute a release of its security interest in the Vehicle, and CAC's choice to do so was, and is, willful and knowing. CAC continues to unlawfully retain the security interest to the present day.

239.    CAC also needlessly delayed Plaintiff's registration of the Vehicle in Rhode Island.

240.    Rhode Island does not participate in the Electronic Lien and Title Program used in Massachusetts and other states; instead, a paper title is required.

241.    On or about July 8, 2025, Plaintiff contacted CAC and the Rhode Island Division of Motor Vehicles ("RI DMV") for guidance on transferring the Vehicle's title from Massachusetts to Rhode Island. Both CAC and the RI DMV advised Plaintiff to complete RI DMV's "Title Request for Lienholder or Leasing Company" form ("Title Request Form") and submit it to CAC.

242.    On or about July 8, 2025, Plaintiff sent the completed Title Request Form to CAC by fax.

243.    Over a month later, on or about August 25, 2025, CAC requested a paper title for the Vehicle from the Massachusetts Registry of Motor Vehicles ("MA RMV"). The MA RMV printed a paper title for the Vehicle and mailed it to CAC the same day.

244.    The RI DMV received the Massachusetts paper title from CAC on or about September 19, 2025—over two months after Plaintiff first sent CAC his request.

245.    This unreasonable delay resulted in a two-month period where Plaintiff was unable to use his Vehicle. Once again, Plaintiff had to rely on Uber and rental cars to get around.

**Plaintiff Is Not the Only Victim of CAC's Predatory Scheme**

246.    Plaintiff is not the only consumer harmed by this predatory scheme. On or about February 27, 2019, Consumer-1 purchased a used 2014 Chevrolet Spark ("Spark Vehicle") with 65,264 miles on the odometer from CCC.

247.    On or about March 5, 2019, Consumer-1 submitted a complaint to the Massachusetts Office of the Attorney General ("MA AGO"), which included copies of the Spark RIC and Spark Bill of Sale.

248.    On or about March 21, 2019, Consumer-1 submitted a complaint to the MA AGO to report what Consumer-1 described as the "illegal loan" in hopes of protecting others from the same deceit.

249.    On information and belief, CCC published an advertisement for the Spark Vehicle on its website, which identified the price as $4,995.00.

250.    The retail installment contract for the Spark Vehicle ("Spark RIC") lists a "Cash Price" of $8,625.00. The bill of sale for the Spark Vehicle ("Spark Bill of Sale") shows a "Selling Price" of $8,625.00.

251.    The Spark RIC includes a finance charge of $4,201.31, sales tax in the amount of $554.63, a charge of $1,399.00 for an "Optional Extended Warranty or Service Contract" paid to WEC, and a "Doc Fee" of $249.00 paid to CCC.

252.    The Spark Bill of Sale identifies "Processing Fees" of $249.00 paid to CCC.

253.    The Spark RIC was executed using electronic signatures.

254.    On or about September 28, 2019, Consumer-2 purchased a used 2012 Subaru Legacy with approximately 90,604 miles on the odometer from International Motor Group in Warwick, Rhode Island. CAC financed the sale.

255.    Consumer-2 submitted a complaint to the Rhode Island Office of the Attorney General ("RI AGO"), which included copies of Consumer-2's retail installment contract assigned to CAC, disclosure form, and VSC through Wynn's Extended Care. Consumer-2's complaint stressed that they were "unaware of [the] cost of credit" and that "the dealer made out due to extra costs on the contract [that Consumer-2] was not knowledgeable about or explained."

256.    On or about September 13, 2022, Consumer-3 and Consumer-4 purchased a used 2013 Nissan Rogue from Grasso's Auto Sales, Inc. ("Grasso") in Providence, Rhode Island. CAC financed the sale.

257.    Consumer-3 submitted a complaint to the RI AGO regarding Grasso's and CAC's misleading and deceptive behavior. Specifically, when Grasso learned that CAC would not approve Consumer-4 for the loan, Grasso unilaterally removed Consumer-4's name from the loan. Grasso then electronically signed the contract in Consumer-3's name. Consumer-3 never gave Grasso permission to electronically sign the contract in Consumer-3's name only.

258.    On or about September 1, 2023, Consumer-5 purchased a used 2009 Dodge Charger ("Charger Vehicle") with approximately 191,220 miles on the odometer from Auto Space LLC ("Auto Space") in Norfolk, Virginia. CAC financed the sale.

259.    Auto Space listed the price of the Charger Vehicle as $4,999.00 in an advertisement on its website and in a Buyer's Order presented to Consumer-5 on or about August 29, 2023. Despite this, Auto Space raised the price of the Charger Vehicle to $7,100.00, as shown in the Retail Installment Contract ("Charger RIC") and Buyer's Order dated September 1, 2023.

260.    The Charger RIC includes a finance charge of $4,746.18, a charge of $2,196.00 for an "Optional Extended Warranty or Service Contract" paid to WEC, and a charge of $725.00 for "Optional Guaranteed Auto Protection" paid to Phoenix American Administrators, Inc.[8]

261.    Neither the Charger RIC nor the two Buyer's Orders reference Consumer-5's trade-in vehicle.

262.    On or about July 8, 2024, Consumer-5 contacted CAC to request a transfer of the Charger Vehicle's title.

263.    Nearly two months later, on or about September 6, 2024, CAC sent the Virginia title for the Charger Vehicle to the Massachusetts Registry of Motor Vehicles.

264.    CAC repossessed the Charger Vehicle on or about March 27, 2025, and it was sold at auction on or about May 13, 2025.

---

[8] On information and belief, Phoenix American Administrators, Inc., and WEC are under common ownership or control or are otherwise affiliated or related.

## VI.    FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS

265.    Defendants CAC, CCC, Gravina-1, Gravina-2, Gravina-3, and WEC (collectively, the "RICO Defendants") are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in this Complaint.

### Culpable Person

266.    Each of the RICO Defendants is capable of holding a legal or beneficial interest in property and is a "person" within the meaning of 18 U.S.C. § 1961(3).

267.    Each RICO Defendant is distinct from the Association-in-Fact Enterprise alleged herein. The RICO Defendants are individuals and legal entities that employed, associated with, and conducted the affairs of the Enterprise through the pattern of racketeering activity described herein. The Enterprise constitutes an ongoing organization, formal and informal, whose members and associates function as a continuing unit for a common purpose, separate and apart from the individual RICO Defendants.

268.    As detailed more fully herein, each RICO Defendant, directly or indirectly, conducted or participated in the conduct of the Enterprise's affairs through both a pattern of racketeering activity and the collection of unlawful debt.

### Enterprise

269.    The RICO Defendants constituted an association-in-fact enterprise (the "Enterprise").

270.    The Enterprise is an ongoing organization, formal and informal, whose members and associates function as a continuing unit for common purposes of engaging in a course of conduct. The Enterprise possessed a common purpose, relationships among those associated with the Enterprise, and longevity sufficient to permit those associates to pursue the Enterprise's purpose.

271.    The common purpose of the Enterprise was and is to systematically generate exorbitant profits by originating and servicing predatory motor vehicle retail installment contracts through a coordinated, multi-faceted scheme to defraud a targeted class of vulnerable, subprime consumers.

272.    This unified purpose was achieved through the following interdependent components: (a) deceptively marketing and selling used vehicles, including those with known, material defects, to lure consumers; (b) employing a proprietary, score-based underwriting model designed not to assess a borrower's ability to repay, but to maximize dealer compensation and lender profit by predicting default and embedding hidden finance charges; (c) inflating the principal amount of loans to conceal the true cost of credit and circumvent state usury laws; (d) utilizing a deceptive electronic signature process to obscure the onerous and fraudulent terms of loan agreements and prevent meaningful review; and (e) pressuring consumers through misrepresentation into purchasing overpriced, high-margin add-on products like the vehicle service contract administered by WEC, further inflating the debt burden.

273.    The relationships among the associates of the Enterprise were cemented by formal agreements, financial incentives, and a high degree of interdependence and coordination.

274.    CAC and CCC were financially interdependent. CCC's primary compensation for a sale was the upfront CAC Payment, which was calculated by CAC based on the inflated loan amount. This created a powerful incentive for CCC to maximize the total cost of the loan to the consumer. CAC, in turn, profited even if the borrower defaulted, so long as its collections exceeded the CAC Payment it made to the dealer.

275.    The relationships within the Enterprise formed a *de facto* chain of command and a continuous, structured framework for executing the scheme. CAC sat at the apex, designing the

business model, providing the essential tools (CAC Software, E-Sign Software, marketing materials, and training), and funding the transactions. The Gravina Defendants and CCC operated at the execution level, implementing CAC's system through deceptive sales practices, false representations, and the manipulation of the software inputs. WEC was integrated as a pre-approved vendor, whose product was used as a key tool to inflate loan principals and generate additional fee income for the Enterprise. This structure was not ad hoc; it was codified in formal agreements and reinforced by the continuous financial interdependence of the parties.

276. The Enterprise was not an ad hoc arrangement for a single transaction but a continuing unit that operated—and continues to operate—over many years. The Enterprise's business model, as described in CAC's own public filings and training materials, is designed for repeat, systematic application across a national network of thousands of dealers. The specific relationship between CAC and its Dealers, including CCC, and the pattern of conduct alleged herein, persisted before, during, and after Plaintiff's transaction on October 30, 2021.

277. The longevity of the Enterprise is demonstrated by its closed-ended continuity—a series of related predicate acts over a substantial period of time, as shown by the experiences of Consumer-1 (2019), Plaintiff (2021), and Consumer-5 (2023). Furthermore, the Enterprise exhibits open-ended continuity because, absent court intervention, the alleged racketeering acts pose a threat of continuing into the future. The Enterprise's business model is built for repetition across a national network of dealers, and the underlying economic incentives that drive the scheme remain in place.

278. The Enterprise is an entity separate and apart from the pattern of activity in which it engages. The Enterprise's existence is defined by the structured, profit-driven collaboration of its members, not merely by the racketeering acts themselves. The RICO Defendants are distinct

from the Enterprise they jointly operated. No single RICO Defendant constituted the entire Enterprise; rather, each played a specific role within the associative whole.

### Interstate Commerce

279.    The Enterprise, and its pattern of racketeering activity, engaged in and affected interstate commerce. The interstate commerce nexus is established by the Enterprise's own business activities, which are inherently national and international in scope, and by its use of the instrumentalities of interstate commerce to execute its fraudulent scheme.

280.    *First,* the Enterprise itself was directly engaged in the production, distribution, and acquisition of goods and services in interstate commerce. CAC is a Michigan corporation that operates a nationwide subprime auto lending business, contracting with dealers across state lines, including CCC in Massachusetts. WEC is a California corporation that administers vehicle service contracts sold to consumers nationwide. The Vehicle at the heart of this transaction, a Hyundai Sonata, was manufactured in Alabama and contained components designed in Michigan and sourced through a global supply chain. The Enterprise's core purpose of originating and servicing financed used vehicle sales involved the continuous flow of goods, capital, and services across state lines.

281.    *Second,* the Enterprise routinely used the mails and interstate wires, the instrumentalities of interstate commerce, to conduct its affairs and execute the pattern of racketeering activity. This use was essential to the scheme. Specifically, the Enterprise used interstate wire transmissions to submit fraudulently originated loan contracts for approval and funding, the U.S. Mail to deliver deceptive payment demands and collection notices to Plaintiff across state lines, and the interstate banking system to process down payment checks and execute automatic monthly withdrawals.

282.    *Third,* the Electronic RIC and VSC each state: "it is expressly agreed that this Contract evidences a transaction in interstate commerce."[9]

## Pattern of Racketeering

283.    The RICO Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5). A pattern requires at least two predicate acts of racketeering activity within a ten-year period. Here, the RICO Defendants have committed numerous related predicate acts, including extortion (Mass. Gen. Laws ch. 271, § 39(b)), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), interference with commerce by threats (18 U.S.C. § 1951), and engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957). These acts are related and constitute both a closed-ended period of repeated misconduct spanning years and an open-ended threat of continued criminal activity.

284.    The numerous predicate acts described herein are not isolated events. They are related to each other, sharing common purposes, participants, victims, and methods of commission, forming a coherent and ongoing pattern.

285.    The overarching purpose of every predicate act was to enrich the RICO Defendants by systematically deceiving subprime consumers into entering into predatory loan agreements for overvalued and/or defective vehicles, and then enforcing those usurious debts.

286.    The acts were perpetrated by the same core group of participants—CAC, CCC, Gravina-1, and Gravina-2—acting in concert as the Enterprise. Gravina-3, as the owner of the CCC Facility and spouse of Gravina-1, provided the essential physical premises from which the Enterprise's predatory sales and fraudulent loan origination operated, receiving rental income

---

[9] The Spark RIC and Charger RIC also contain this clause.

derived from the scheme. WEC participated by providing a pre-approved add-on product that was deceptively sold to inflate loan principals.

287.    The acts targeted a specific class of victims: subprime and deep-subprime consumers, like Plaintiff, Consumer-1, and Consumer-5, who had limited financing options and were uniquely vulnerable to deceptive sales and lending practices.

288.    The Enterprise employed a uniform and replicable method: deceptive online advertising, a manipulative in-person sales process, the use of a proprietary electronic signature platform to obscure loan terms, the inflation of loan principals through a score-based model, and the pressured sale of add-on products.

289.    The predicate acts constitute a pattern because they amount to, and pose a threat of, continued racketeering activity. This is demonstrated by both closed-ended and open-ended continuity.

290.    The Enterprise's conduct persisted over a substantial period of time. The specific relationship between CAC and its Dealers, including CCC, and the pattern of conduct alleged herein, existed before, during, and after Plaintiff's transaction on October 30, 2021. The longevity of the Enterprise is further evidenced by the similar experiences of other consumers, such as Consumer-1 in 2019 and Consumer-5 in 2023, demonstrating a continuous and ongoing pattern of racketeering activity spanning several years.

291.    The Enterprise's scheme is a regular way of conducting business for the RICO Defendants. CAC's business model is built upon its nationwide network of dealers, its proprietary software, and its systematic approach to subprime lending. The nature of the scheme—a centralized lender working with a distributed network of dealers—inherently poses a threat of repetition into the future. The RICO Defendants' continued operation, their failure to

materially alter their practices despite thousands of consumer complaints, and the ongoing harm to Plaintiff and other identifiable consumers confirm that the threat of continued racketeering activity is clear and present.

## Racketeering Activity

292.    The RICO Defendants have engaged in a pattern of racketeering activity by committing multiple predicate acts, which are indictable under the listed statutes and constitute "racketeering activity" as defined by 18 U.S.C. § 1961(1). The predicate acts were not isolated events but were integral, related steps in the Enterprise's scheme to defraud Plaintiff and similarly situated consumers.

### *Extortion*

293.    The RICO Defendants committed multiple predicate acts of extortion which are chargeable under Mass. Gen. Laws ch. 271, § 39(b), and punishable by imprisonment for more than one year and thus constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(A).

294.    Gravina-2, acting as an agent of CCC, extorted Plaintiff when Gravina-2 verbally communicated to Plaintiff that purchase of the VSC was a mandatory requirement to obtain financing from CAC. This communication was a threat to deprive Plaintiff of the economic opportunity to purchase the Vehicle and obtain financing, as refusal would have resulted in the cancellation of the entire transaction. This threat was made with the intent to compel Plaintiff to purchase the VSC against his will and to pay the associated fee, thereby conferring a pecuniary advantage on CCC, WEC, and CAC. Plaintiff, having already invested time and resources, was compelled to acquiesce to avoid the threatened economic injury.

295.    Gravina-2 further extorted Plaintiff after Gravina-2 affixed Plaintiff's electronic signature to the Electronic Transaction Documents without Plaintiff's control or consent. When

Plaintiff questioned the discrepancy in the E-Sign Declaration, Gravina-2 stated, "Well, it's too late now. You want the car, right? Just sign the form." This statement was a threat to cancel the vehicle sale and financing, thereby inflicting an economic injury, and was made with the intent to compel Plaintiff to sign the false declaration against his will. The coerced signature had significant pecuniary value to the Enterprise, as it served to legitimize and insulate the fraudulent loan documents from challenge.

296.    These acts of extortion are not isolated events but are interrelated steps in the Enterprise's coordinated scheme to enrich its members through coercion. They demonstrate a pattern of using threats of economic injury to force consumers into unfavorable terms and to maintain the profitability of predatory loans.

### *Mail Fraud*

297.    The RICO Defendants committed multiple predicate acts of mail fraud in violation of 18 U.S.C. § 1341, which constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Each mailing was a step in the execution of the Enterprise's scheme to defraud and was reasonably foreseeable.

298.    As part of the scheme to induce Plaintiff into an unconscionable loan agreement with hidden costs, CAC caused to be sent by the United States Postal Service ("USPS") numerous documents designed to enforce the fraudulently obtained debt. These mailings include:

(a)    *Payment Due Notices:* On at least 21 separate occasions between November 16, 2021, and July 16, 2025, CAC sent a document titled "PAYMENT DUE NOTICE" via USPS first-class mail to Plaintiff at his addresses in Massachusetts and Rhode Island. These notices demanded monthly payments of $345.93 (later $299.92) based on the inflated and deceptive "Amount Financed" and "Total of Payments" figures set forth in the Electronic RIC.

(b)    *Rights of Defaulting Buyer Notices:* On November 18, 2022, May 16, 2024, and July 16, 2024, CAC sent an RDB Notice via USPS first-class mail to Plaintiff.

(c)    *Collection Letter:* On or about August 1, 2022, CAC sent a letter by USPS first-class mail to Plaintiff with the subject "Debt owed to Credit Acceptance Corporation," which falsely stated that a balance of $594.84 was "more than 30 days past due and owing."

299.    As part of the scheme to conceal the fraudulent sale of the VSC and to implement a unilateral, detrimental conversion of Plaintiff's account, CAC caused to be sent by USPS the following:

(a)    *VSC Cancellation Offer:* On or about October 31, 2021, CAC sent a document titled "IMPORTANT OFFER TO CANCEL VEHICLE SERVICE CONTRACT (VSC) AND RECEIVE FULL REFUND" via USPS first-class mail to Plaintiff. This mailing, while ostensibly disclosing that the VSC was optional, furthered the fraud by omitting material information about the negative consequences of cancellation, namely the conversion of Plaintiff's account from a pre-computed to an interest-bearing structure.

(b)    *VSC Cancellation Confirmation:* On or after November 20, 2021, CAC sent a confirmation letter via USPS first-class mail to Plaintiff stating that the VSC had been cancelled and that the account had been converted to an interest-bearing structure, thereby consummating the deceptive account conversion and presenting it as a *fait accompli.*

300.    Each of the above-described mailings was incident to an essential part of the Enterprise's schemes. The mailings were used to induce Plaintiff into accepting the fraudulent

loan terms, to collect payments on the fraudulently inflated debt, to conceal and implement the

deceptive account conversion, and to threaten illegal action to perpetuate the scheme. The use of

USPS was a necessary and integral part of the execution of the schemes.

*Wire Fraud*

301.    The RICO Defendants committed multiple predicate acts of wire fraud in

violation of 18 U.S.C. § 1343, which constitute "racketeering activity" within the meaning of 18

U.S.C. § 1961(1)(B). The use of interstate wire communications was not merely incidental but

was essential to the execution, concealment, and perpetuation of the Enterprise's fraudulent

scheme. Each transmission was a step in a calculated process to lure Plaintiff, bind him to a

usurious and fraudulently induced loan, and then enforce that illegal debt.

302.    The scheme was initiated and propelled by the use of interstate electronic

platforms and wires to solicit Plaintiff through deceptive advertisements. Specifically:

(a)    On or about October 16, 2021, CCC published an advertisement for the

Vehicle on its Facebook business page, a platform that operates through and relies upon

interstate and international data transmission servers to display content to users across

state lines.

(b)    On or about October 19, 2021, CCC published an advertisement for the

Vehicle on its commercial website. The traffic to and from this website, hosted on servers

located outside of Massachusetts, necessarily traveled through the instrumentalities of

interstate commerce.

303.    The core of the fraudulent loan origination was executed through CAC's

proprietary software, which functions entirely via interstate data transmissions. The submission

of the falsified Electronic RIC—including its understated down payment, inflated principal, and

deceptively hidden finance charges—from CCC in Massachusetts to CAC in Michigan via the

CAC Software was a central and essential step in executing the scheme. This wire transmission was the mechanism through which the RICO Defendants obtained fraudulently derived funds, as it triggered the CAC Payment from CAC to CCC and bound Plaintiff to the usurious and deceptive loan terms. But for this interstate wire communication, the fraudulent loan would not have been funded, and Plaintiff would not have been injured.

304.    The scheme further utilized the interstate banking system to process and convert Plaintiff's funds. Plaintiff's down payment checks were deposited by CCC into its financial institution. The processing and clearing of these checks necessarily involved the use of the interstate banking system, including Federal Reserve wires and electronic fund transfer networks. A portion of these funds, $2,100.00, was unlawfully converted by CCC and never credited to the transaction, making the use of interstate wires integral to obtaining and concealing the proceeds of this aspect of the fraud.

305.    Following the origination of the loan, the Enterprise relied on interstate wires to manage the account, collect payments, and induce Plaintiff into acquiescence, thereby concealing the fraud and furthering the scheme's profitability. These wire communications include, but are not limited to:

(a)    On at least 16 separate occasions between December 16, 2021, and May 16, 2023, CAC sent Plaintiff an email with the subject "Important: Your Payment Due Notice is now available." The body of these emails instructed Plaintiff to log into CAC's Customer Portal, a system operating on interstate servers, to view his payment notice for the fraudulently inflated debt.

(b)    On at least 19 separate occasions between December 27, 2021, and July 11, 2023, CAC sent Plaintiff an email with the subject "Credit Acceptance AutoPay,"

which informed him that an "automatic payment of $299.92" would be withdrawn from his bank account, further enforcing the collection of the unlawful debt through an electronic payment system that processes transactions across state lines.

306.    Each of these interstate wire communications was made for the purpose of executing the scheme to defraud. The advertisements solicited the victim, the software transmission executed the core fraud, the check processing secured the illegally obtained down payment, and the account emails facilitated the ongoing collection and concealed the scheme by presenting a facade of a legitimate, ongoing business relationship. The use of wires was thus integral to the entire lifecycle of the fraudulent transaction.

### *Interference with Commerce by Threats*

307.    The RICO Defendants committed at least one predicate act of interference with commerce by threats, in violation of 18 U.S.C. § 1951, which constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).

308.    The RICO Defendants, through CAC, engaged in a pattern of extortionate conduct aimed at obtaining Plaintiff's property—namely, continued loan payments and ultimately the Vehicle itself.

309.    The extortionate acts threatened to disrupt, and did disrupt, the flow of interstate commerce by coercing payments on a fraudulently originated loan and by attempting to seize an asset (the Vehicle) that was the subject of interstate transactions.

310.    On or about September 4, 2025, CAC, through a written communication, threatened to repossess the Vehicle from Plaintiff's property in Rhode Island. This threat was made after Plaintiff had explicitly revoked any consent for CAC or its agents to enter his property, having sent a "Notice of No Trespass" to CAC on or about August 11, 2025.

311. Under Rhode Island law, a creditor may not repossess a vehicle from a consumer's property without the consumer's contemporaneous consent. R.I. Gen. Laws § 6-51-4(a). Therefore, any attempt by CAC to seize the Vehicle from Plaintiff's property following his revocation of consent would constitute an unlawful, trespassory conversion. CAC's threat to commit this unlawful trespass and conversion was a wrongful use of threatened force against Plaintiff's property, intentionally designed to instill fear.

312. This attempted extortion was not an isolated event but was a foreseeable culmination of the Enterprise's business model: originating unaffordable and fraudulently inflated loans through deception (spearheaded by CCC and the Gravina Defendants) and then enforcing them through coercive, and often unlawful, collection tactics (executed by CAC). This violation is thus a direct predicate act stemming from the pattern of racketeering activity conducted by the Enterprise.

*Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity*

313. The RICO Defendants committed multiple predicate acts of engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957, which constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).

314. CCC, with the financial backing and facilitation of CAC, knowingly engaged in monetary transactions involving criminally derived property with a value greater than $10,000. Specifically, the CAC Payment—the upfront proceeds CCC received from CAC for the assignment of Plaintiff's and other consumers' fraudulently originated retail installment contracts—constituted proceeds obtained from the Enterprise's ongoing mail and wire fraud schemes, which are "specified unlawful activities" under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B).

315.    CCC used these criminally derived proceeds to acquire its vehicle inventory, including the specific Vehicle that was later sold to Plaintiff. The acquisition of the Vehicle constituted a "monetary transaction" and a "financial transaction" within the meaning of 18 U.S.C. §§ 1957(f)(1) and 1956(c)(4), as it involved the transfer of title to a vehicle and the use of the financial system, affecting interstate commerce.

316.    By purchasing the Vehicle with funds derived from the Enterprise's pattern of racketeering activity, CCC knowingly "recycled" the illicit proceeds back into the Enterprise, enabling it to acquire the very asset that would be used to perpetuate the next stage of the fraud against Plaintiff. This act of using fraudulently obtained financing to stock its lot with saleable vehicles was a crucial step in maintaining and advancing the Enterprise's criminal purpose.

317.    CAC, in turn, knowingly engaged in a monetary transaction by providing the criminally derived CAC Payment to CCC to finance the purchase of vehicle inventory. CAC had actual knowledge of the fraudulent nature of the proceeds it was recycling. This financing constituted a "transaction involving the use of a financial institution" within the meaning of 18 U.S.C. § 1956(c)(4)(B).

### Collection of Unlawful Debt

318.    The Enterprise's conduct also involved the collection of an "unlawful debt" within the meaning of 18 U.S.C. § 1961(6).

319.    An "unlawful debt" includes a debt that was incurred in connection with the "business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6)(B).

320.    The debt obligation created by the Electronic RIC, which Plaintiff was required to pay, is usurious under Massachusetts law. The maximum lawful interest rate for a retail

installment sale of a motor vehicle in Massachusetts is 21% per annum. Mass. Gen. Laws ch. 255B, § 14.

321.    The true cost of credit in Plaintiff's transaction, when recalculated to include the hidden finance charges that CAC, CCC, and Gravina-2 deceptively embedded within the inflated "Amount Financed," results in an effective APR of at least 54.34%, which is more than twice the lawful interest rate of 21%.

322.    The true cost of credit in Consumer-1's transaction, when recalculated to include the hidden finance charges that CAC, CCC, and Gravina-2 deceptively embedded within the inflated "amount financed," results in an effective APR of at least 56.05%, which is more than twice the lawful interest rate of 21%.

323.    The true cost of credit in Consumer-5's transaction, when recalculated to include the hidden finance charges that CAC and Auto Space deceptively embedded within the inflated "amount financed," results in an effective APR of at least 97.05%, which is more than twice the lawful interest rate of 26.99%.[10]

324.    This usurious debt was not an isolated occurrence but was incurred in connection with CAC's business of lending money at usurious rates. The Enterprise's business model is systematically designed to generate such usurious obligations for subprime borrowers like Plaintiff, Consumer-1, and Consumer-5.

325.    The RICO Defendants, through the Enterprise, have engaged in the collection of this unlawful debt. Each monthly payment demand and collection effort by CAC constitutes an act of collecting the unlawful debt.

---

[10] In Virginia, where Consumer-5's transaction was originated, the maximum lawful interest rate for a motor vehicle retail installment contract is the rate agreed to between the buyer and seller, which was 26.99%.

326.    CCC and Gravina-2 directly participated in the conduct of the Enterprise's affairs through the collection of an unlawful debt by creating and submitting the fraudulent Electronic Transaction Documents to CAC. This act was the essential first step that initiated the entire collection process. By fabricating and forwarding this document, CCC and Gravina-2 knowingly placed a usurious debt into the stream of commerce, enabling and facilitating its subsequent collection by the Enterprise.

327.    The Enterprise's repeated collection efforts, including the numerous payment demands and related communications sent to Plaintiff, demonstrate a sustained effort to collect the usurious obligation.

328.    Accordingly, the RICO Defendants have conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the collection of an unlawful debt in violation of 18 U.S.C. § 1962.

## VII.    CAUSES OF ACTION

### COUNT ONE – Violation of RICO Act, 18 U.S.C. § 1962(c) (Conduct or Participation) (Against CAC, CCC, Gravina-1, Gravina-2, and WEC)

329.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

330.    The Enterprise is an enterprise engaged in and whose activities affect interstate commerce. CAC, CCC, Gravina-1, Gravina-2, and WEC (the "Count One Defendants") are employed by or associated with the enterprise.

331.    The Count One Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically:

(a)    CAC designed and controlled the predatory scheme, providing the proprietary software, training, and funding that enabled fraudulent loans. It knowingly purchased usurious debts from its dealers, sent deceptive collection communications via mail and wire, and unilaterally altered the terms of Plaintiff's loan to his detriment.

(b)    CCC and Gravina-2 executed the scheme at the point of sale by publishing deceptive advertisements, misrepresenting the Vehicle's trim level and condition, falsely stating that a VSC was mandatory, inflating the loan principal, and fraudulently affixing Plaintiff's e-signature to the loan documents without his meaningful consent.

(c)    Gravina-1, as a member and manager of CCC, authorized, directed, and benefited from the fraudulent practices carried out by CCC and Gravina-2.

(d)    WEC participated as a key vendor in the enterprise, providing a high-margin add-on product that was deceptively sold to inflate loan principals, generating substantial fees for itself and the other RICO Defendants.

332.    Pursuant to and in furtherance of their fraudulent scheme, the Count One Defendants committed multiple related acts of extortion, mail fraud, wire fraud, interference with commerce by threats, and engaging in monetary transactions in property derived from specified unlawful activity.

333.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

334.    The Count One Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

335.    The Count One Defendants further agreed to and did conduct and participate in the conduct of the enterprise's affairs through the collection of unlawful debt.

336.    As a direct and proximate result of the Count One Defendants' racketeering activities, collection of unlawful debt, and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his property in that: he was induced into a usurious loan for a defective vehicle; he was charged and paid hidden finance charges; he was defrauded into purchasing an unwanted VSC; a portion of his down payment was feloniously converted; he was saddled with a more expensive loan after a unilateral account conversion; and he has been subjected to ongoing collection efforts on an unlawful debt.

337.    As a direct and proximate result of Count One Defendants' violations of 18 U.S.C § 1962(c), Plaintiff has been damaged in an amount to be proven at trial, including costs associated with investigating and rectifying the Count One Defendants' conduct.

338.    As a result of the Count One Defendants' violation of 18 U.S.C. § 1962(c), Plaintiff is entitled to treble damages and the costs of this suit, including reasonable attorneys' fees.

### COUNT TWO – Violation of RICO Act, 18 U.S.C. § 1962(d) (Conspiracy)<br>(Against CAC, CCC, Gravina-1, Gravina-2, Gravina-3, and WEC)

339.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

340.    CAC, CCC, Gravina-1, Gravina-2, Gravina-3, and WEC (the "Count Two Defendants") have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity. The Count Two Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described

above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

341.    Gravina-3, as the owner of the premises from which the enterprise operated and the spouse of Gravina-1, facilitated the scheme and benefited from its proceeds, thereby furthering the conspiracy's objectives and the resulting harm to Plaintiff.

342.    As direct and proximate result of the Count Two Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in his property in that: he was induced into a usurious loan for a defective vehicle; he was charged and paid hidden finance charges; he was defrauded into purchasing an unwanted VSC; a portion of his down payment was feloniously converted; he was saddled with a more expensive loan after a unilateral account conversion; and he has been subjected to ongoing collection efforts on an unlawful debt.

343.    As a direct and proximate result of the Count Two Defendants' violations of 18 U.S.C § 1962(d), Plaintiff has been damaged in an amount to be proven at trial, including costs associated with investigating and rectifying the Count Two Defendants' conduct.

344.    As a result of the Count Two Defendants' violation of 18 U.S.C. § 1962(d), Plaintiff is entitled to treble damages and the costs of this suit, including reasonable attorneys' fees.

**COUNT THREE – Violation of Mass. Gen. Laws ch. 231, § 85J (Fraud or Deceit in Sale of Personal Property)**
**(Against CAC, CCC, Gravina-1, Gravina-2, and WEC)**

345.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

346.    The Vehicle constitutes tangible, movable personal property.

347.    CAC, CCC, Gravina-1, Gravina-2, and WEC (the "Count Three Defendants")
engaged in a systematic course of fraud and deceit in the course of selling the Vehicle to
Plaintiff.

348.    The scheme began with deceptive advertisements published by CCC on or about
October 16 and 19, 2021. These advertisements, displayed on CCC's Facebook page and
commercial website, materially misrepresented the Vehicle as a "Limited Trim" model and
"CARFAX CERTIFIED." In reality, the Vehicle was a lower-tier SE trim model lacking the
premium features advertised, and no such "CARFAX Certified" designation exists. CCC and
Gravina-2 made these representations with reckless disregard for the truth, as the Vehicle's own
CARFAX report, accessible to them, confirmed the true SE trim level.

349.    This fraud continued during the in-person sales process at CCC's facility in
Hyannis, Massachusetts, on October 26 and 30, 2021. CCC and Gravina-2 provided Plaintiff
with the Purchase Agreement that again falsely identified the Vehicle as a "Limited."
Furthermore, CCC and Gravina-2 actively concealed a known, material, and dangerous defect:
the Vehicle's 2.4-liter Theta II engine was inherently defective and prone to sudden, catastrophic
failure. This latent safety risk, which substantially impaired the Vehicle's value and operation,
was not reasonably discoverable by Plaintiff and was deliberately withheld to induce the sale.

350.    The fraud was further executed through the predatory financing of the Vehicle,
orchestrated by CAC and executed by CCC, Gravina-1, and Gravina-2. Using CAC's proprietary
software, these Defendants structured a loan that deceptively inflated the principal amount by
embedding hidden finance charges. The cash price of the Vehicle was inflated by at least
$2,000.00 above its advertised value, and this amount was disguised within the "Amount

Financed" in the Electronic RIC, thereby misrepresenting the true principal and finance charge to Plaintiff.

351.    A central pillar of this scheme was the deceptive sale of the VSC. Defendant WEC participated in this fraud by providing a pre-approved, high-margin add-on product that was integrated into CAC's financing platform and deceptively marketed to consumers. On information and belief, WEC knew or should have known that its product was being systematically misrepresented by CAC's network of dealers, including CCC, as a mandatory requirement for financing. WEC accepted the benefits of these fraudulent sales, collecting fees from consumers like Plaintiff who were coerced into purchasing the VSC under false pretenses. By designing its product to be sold within this deceptive framework and turning a blind eye to the rampant misrepresentations, WEC became a willing participant in the fraud.

352.    At the point of sale on October 30, 2021, Gravina-2, on behalf of CCC and acting pursuant to the scheme designed by CAC and facilitated by WEC, made a material misrepresentation to Plaintiff, falsely stating that purchasing the VSC for $1,586.00 was a mandatory condition of obtaining financing from CAC. This statement was knowingly false, as the VSC was an optional product, and was made to inflate the loan principal and generate illicit profits for all Count Three Defendants.

353.    In a final act of deceit, CCC and Gravina-2 feloniously converted a portion of Plaintiff's down payment for their own benefit. Although Plaintiff paid $5,100.00 in total down payments, the Electronic RIC was falsified to reflect only a $3,000.00 down payment. CCC and Gravina-2 intentionally withheld and converted the remaining $2,100.00 of Plaintiff's funds.

354.    Each of these misrepresentations and acts of concealment was material, was made with knowledge of its falsity or with reckless disregard for the truth, and was intended to induce

Plaintiff to purchase the Vehicle and enter into a usurious loan agreement. Plaintiff justifiably relied on these representations and, as a direct and proximate result, has been damaged in an amount to be proven at trial, including but not limited to the overpayment for a misrepresented and defective vehicle, payment for a fraudulently induced VSC, loss of his converted down payment, and payment of hidden and usurious finance charges.

355.    As a result of the Count Three Defendants' violation of Mass. Gen. Laws ch. 231, § 85J, Plaintiff is entitled to treble damages.

### COUNT FOUR – Violation of Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D (Against CAC)

356.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

357.    To provide financing in Massachusetts, CAC uses a retail installment sale. Retail installment sales for motor vehicles are governed by Mass. Gen. Laws ch. 255B, which in turn incorporates the Massachusetts Consumer Credit Cost Disclosure Act ("CCCDA"), Mass. Gen. Laws ch. 140D, and regulations thereunder. Mass. Gen. Laws ch. 140D, in turn, incorporates the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and regulations thereunder if Massachusetts does not have "regulations that are substantially similar to or afford more protection to consumers than" regulations under TILA. Mass. Gen. Laws ch. 140D § 3(a). Together, these laws and regulations are designed to ensure accurate and complete disclosures are made to a prospective buyer on the face of the RIC.

358.    Defendant CAC is a "Creditor" within the meaning of 15 U.S.C. § 1602(g) and Mass. Gen. Laws ch. 140D, § 1.

359.    The RIC used by CAC failed to comply with the requirements of 15 U.S.C. §§ 1605, 1606, and Mass. Gen. Laws ch. 140D, including but not limited to, by failing to disclose

the total cash price of the Vehicle, failing to disclose the hidden finance charge, and failing to prominently disclose the true APR.

360. As a direct result of the deceptive loan created by CAC, Plaintiff was obligated to make exorbitant monthly payments on a vehicle that was inherently defective and ultimately inoperable for a year. CAC financed a product they knew or should have known was virtually worthless and dangerous, locking Plaintiff into a destructive debt obligation for a failed asset.

361. As a direct and proximate result of CAC's failure to disclose key terms of Plaintiff's loan agreement on the RIC, Plaintiff has been damaged in an amount to be proven at trial.

362. As a result of the CAC's violations of TILA and CCCDA, Plaintiff is entitled to actual damages and twice the amount of any finance charge in connection with the transaction. 15 U.S.C. § 1640(a)(1), (a)(2)(A); Mass. Gen. Laws ch. 140D, § 32(a)(1), (a)(2)(a).

## COUNT FIVE – Violation of Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x, and Consumer Reporting Act, Mass. Gen. Laws ch. 93, § 50–56 (Against CAC)

363. Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

364. CAC is a "person" within the meaning of 15 U.S.C. § 1681a(b) and a "furnisher" within the meaning of 12 C.F.R. § 1022.41(c).

365. Plaintiff is a "consumer" within the meaning of 15 U.S.C. § 1681a(c).

366. On or about October 17, 2024, Plaintiff sent a written notice to CAC, disputing the accuracy and enforceability of the loan obligation and informing CAC that it had furnished inaccurate information regarding this account to one or more nationwide consumer reporting agencies ("CRAs").

367.    Plaintiff's dispute notified CAC that the underlying retail installment contract was unenforceable due to fraud, usury, and violations of state and federal law, as detailed throughout this Complaint.

368.    Upon receipt of Plaintiff's dispute, CAC had a duty under federal and state law to conduct a reasonable investigation with respect to the disputed information, review all relevant information provided by Plaintiff, report the results of its investigation to the CRAs, and if the information was found to be inaccurate or could no longer be verified, promptly modify, delete, or permanently block the reporting of that information.

369.    Furthermore, upon receiving notice of a consumer dispute, a furnisher must clearly and conspicuously flag the account as "disputed by consumer" in all subsequent reports to CRAs until the dispute is resolved or the information is deleted.

370.    CAC failed to comply with its statutory duties. In a response dated November 1, 2024, CAC perfunctorily claimed its reporting was "accurate" and that "no changes are necessary," without conducting a meaningful investigation into the substantive legal challenges to the loan's validity that Plaintiff raised.

371.    CAC has further failed and refused, to this day, to flag Plaintiff's account as "disputed by consumer" in any report to any CRA.

372.    The information CAC furnished to the CRAs was, and remains, inaccurate and unverifiable. The account is based on a contract that is void or voidable due to fraud, usury, and violations of the Truth in Lending Act, as alleged herein. A reasonable investigation by CAC would have confirmed that the debt underlying the furnished information is not legally enforceable, rendering the reporting of it as a valid debt inherently inaccurate.

373.    Beyond the fundamental invalidity of the debt, the specific data points CAC furnished to the CRAs were materially inaccurate and did not match its own internal account records. The variances between CAC's internal statements and the balances it reported to TransUnion and Equifax demonstrate a pattern of careless and reckless reporting.

374.    For example, on or about October 31, 2022, CAC reported a balance of $10,082.00 to TransUnion, while its own records showed a balance of $9,986.85—a variance of $95.15.

375.    On or about July 31, 2023, CAC reported a balance of $9,089.00 to both TransUnion and Equifax, while its internal statement showed a balance of $8,708.63—a variance of $380.37.

376.    On or about March 31, 2024, CAC reported a balance of $10,317.00 to both TransUnion and Equifax, while its internal statement showed a balance of $8,748.63—a variance of $1,568.37.

377.    These persistent and significant discrepancies, occurring over a period of years, constitute numerous separate violations of CAC's duty to furnish accurate information.

378.    CAC's violations were committed knowingly, willfully, and/or with reckless disregard for Plaintiff's rights under the FCRA and MCRA. CAC was aware of the specific inaccuracies and the disputed nature of the account yet chose to continue its inaccurate reporting and to willfully omit the required dispute flag.

379.    As a direct and proximate result of CAC's unlawful conduct:

(a)    Inaccurate, unverifiable, and disputed information has been, and continues to be, maintained on Plaintiff's consumer reports;

(b)     Plaintiff's credit standing, reputation, and credit score have been severely damaged;

(c)     Plaintiff has been denied the full benefit of his credit history and has suffered increased difficulty and expense in obtaining credit;

(d)     Plaintiff has suffered emotional distress, anxiety, and frustration; and

(e)     Plaintiff has been damaged in an amount to be proven at trial.

380.    Pursuant to 15 U.S.C. § 1681n(a) and Mass. Gen. Laws ch. 93, § 63, Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, reasonable attorneys' fees, and costs of suit.

## COUNT SIX – Defamation
### (Against CAC)

381.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

382.    CAC is a furnisher of information to one or more nationwide CRAs, including but not limited to TransUnion and Equifax.

383.    Beginning on or about the origination of the loan and continuing to the present, CAC has voluntarily and knowingly published information concerning Plaintiff to these CRAs. This information includes, but is not limited to, the reporting of a specific account balance, payment history, and account status related to the retail installment contract that is the subject of this action.

384.    The information published by CAC was, and is, false and defamatory. Specifically, the information portrays Plaintiff as owing a legally valid and enforceable debt, when in fact the underlying contract is void or voidable due to fraud, usury, and violations of state and federal law, as detailed in the preceding counts.

71

385.    The specific data points furnished by CAC were materially inaccurate and did not match its own internal account records. For instance, CAC reported balances that were inflated by hundreds or even over a thousand dollars compared to its own internal statements.

386.    CAC published this false information with actual malice, or alternatively, with negligence. CAC knew the information was false, or acted with reckless disregard for its truth or falsity, because Plaintiff provided CAC with a detailed written notice on or about October 17, 2024, disputing the validity and accuracy of the debt and the specific account information.

387.    Despite this notice, CAC failed to conduct a reasonable investigation, failed to correct the inaccuracies, and continued to publish the false information.

388.    The persistent and significant discrepancies between CAC's internal records and its reported balances, occurring over a period of years, demonstrate a pattern of careless and reckless disregard for the accuracy of the information it published.

389.    The defamatory publications were made to third parties, namely the CRAs, which then incorporated the false information into Plaintiff's consumer credit reports and disseminated them to potential creditors and other authorized users.

390.    The false statements were of a kind that would tend to hold Plaintiff up to scorn, hatred, ridicule, or contempt in the minds of any considerable and respectable class in the community. Being portrayed as a debtor on a usurious and fraudulently induced loan, and further as a debtor who fails to pay the accurate amount owed, injures Plaintiff's reputation, creditworthiness, and character.

391.    As a direct and proximate result of CAC's defamatory publications:

(a)     Inaccurate, unverifiable, and disputed information has been, and continues to be, maintained on Plaintiff's consumer reports;

(b)      Plaintiff's credit standing, reputation, and credit score have been severely damaged;

(c)      Plaintiff has been denied the full benefit of his credit history and has suffered increased difficulty and expense in obtaining credit;

(d)      Plaintiff has suffered emotional distress, anxiety, and frustration; and

(e)      Plaintiff has been damaged in an amount to be proven at trial.

**COUNT SEVEN – Invasion of Privacy, Mass. Gen. Laws ch. 214, § 1B**
**(Against CAC)**

392.     An individual's financial and credit status, including the validity and status of their debts, is a private matter of substantial concern. The right to be free from the publication of false and damaging financial information is a privacy interest that Massachusetts law is designed to protect.

393.     CAC, acting as a furnisher of information to nationwide CRAs, intentionally, recklessly, and unreasonably intruded upon Plaintiff's privacy by publishing and continuing to publish highly private and inaccurate financial information about him.

394.     CAC's intrusion was unreasonable and substantial. The matters publicized by CAC—namely, the false representation of a valid debt, the specific inaccuracies in the account balance, and the failure to denote the account as disputed—are not of legitimate public concern. To the contrary, they are private financial facts, the publication of which would be highly offensive to a reasonable person of ordinary sensibilities.

395.     The publication of this private, inaccurate financial information has held Plaintiff up to scorn, ridicule, and contempt in the minds of a considerable and respectable segment of the community, including potential creditors, employers, and other authorized users of consumer reports.

396.     As a direct and proximate result of CAC's unreasonable, substantial, and serious invasion of Plaintiff's privacy:

(a)     Inaccurate, unverifiable, and disputed information has been, and continues to be, maintained on Plaintiff's consumer reports;

(b)     Plaintiff's credit standing, reputation, and credit score have been severely damaged;

(c)     Plaintiff has been denied the full benefit of his credit history and has suffered increased difficulty and expense in obtaining credit;

(d)     Plaintiff has suffered emotional distress, anxiety, and frustration; and

(e)     Plaintiff has been damaged in an amount to be proven at trial.

### COUNT EIGHT – Breach of the Implied Warranty of Merchantability, M.G.L. ch. 106, § 2-314 (Against CCC, HMA, HATC, and HMMA)

397.     Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

398.     Plaintiff is a "Buyer" within the meaning of Mass. Gen. Laws ch. 106, § 2-103(1)(a), and a "Consumer" within the meaning of Mass. Gen. Laws ch. 106, § 1-201(b)(11).

399.     CCC, HMA, HATC, and HMMA (the "Count Eight Defendants") are each a "Seller" within the meaning of Mass. Gen. Laws ch. 106, § 2-103(1)(d), and a "Merchant" within the meaning of Mass. Gen. Laws ch. 106, § 2-104(1).

400.     The Vehicle is "Goods" within the meaning of Mass. Gen. Laws ch. 106, § 2-105(1).

401.     Plaintiff is a person whom the Count Eight Defendants might reasonably have expected to use, consume or be affected by the Vehicle.

402.    The Count Eight Defendants knew that purchasers, like Plaintiff, relied upon them to design, manufacture, produce, and sell products that were reasonably safe and not deceptively marketed.

403.    Plaintiff purchased the Vehicle for its intended purpose—namely, a functioning vehicle that would not suddenly fail while driving at a reasonable speed on the highway.

404.    The Vehicle's defects were not open or obvious to Plaintiff as they involved component parts of the Vehicle's engine.

405.    Yet, the Vehicle failed to perform normally, despite Plaintiff's regular maintenance on the Vehicle. The Vehicle ultimately failed due to the catastrophic defects inherent to its engine.

406.    As a direct and proximate result of the Count Eight Defendants' breach of the implied warranty of merchantability, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to, the value of the Vehicle, any maintenance required as a result of the defects, rental car expenses, and costs incurred as a result of the Vehicle's catastrophic failure.

**COUNT NINE – Breach of the Implied Warranty of Fitness for a Particular Purpose, M.G.L. ch. 106, § 2-315
(Against CCC, HMA, HATC, and HMMA)**

407.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

408.    Plaintiff relied on the skill and judgment of CCC, HMA, HATC, and HMMA (the "Count Nine Defendants") in purchasing the Vehicle.

409.    As a direct and proximate result of the Count Nine Defendants' breach of the implied warranty of fitness for a particular purpose, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to, the value of the Vehicle, any maintenance

required as a result of the defects, rental car expenses, and costs incurred as a result of the Vehicle's catastrophic failure.

**COUNT TEN – Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.***
**(Against CCC and HMA)**

410.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

411.    The Vehicle is a "consumer product" within the meaning of 15 U.S.C. § 2301(1) and 16 C.F.R. § 703.1(b).

412.    Plaintiff is a "consumer" within the meaning of 15 U.S.C. § 2301(3) and 16 C.F.R. § 703.1(g).

413.    CCC and HMA are each a "supplier" within the meaning of 15 U.S.C. § 2301(4) and a "warrantor" within the meaning of 15 U.S.C. § 2301(5) and 16 C.F.R. § 703.1(d).

414.    TXXI is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

415.    The Vehicle was covered by an express warranty issued by CCC.

416.    Plaintiff notified CCC of the defect in the Vehicle. Despite this notice, CCC failed to remedy the defect.

417.    CCC ignored Plaintiff's dispute for numerous months and generally failed to perform the obligations it expressly agreed to under the terms of its warranty.

418.    The Vehicle was also covered by an express, lifetime warranty issued by HMA, which covers "[r]epair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama (HMMA), Kia Motors Manufacturing Georgia (KMMG) or Hyundai Motor America (HMA) that is found to be defective in material or workmanship under normal use and maintenance[.]" The

warranty further provides that "Warranty service will be provided by an authorized Hyundai Dealer without charge for parts or labor."

419.    Plaintiff notified HMA and its authorized agent, BHCC, of the defect in the vehicle. Despite this notice, HMA failed to remedy the defect. BHCC falsely represented that the Vehicle was ineligible for warranty coverage, and BHCC and HMA failed to remedy the defect until nearly a year later.

420.    HMA ignored Plaintiff's dispute for numerous months and generally failed to perform the obligations it expressly agreed to under the terms of its warranty and communications with Plaintiff. HMA failed to remedy the defect in the Vehicle's engine within a reasonable time and it breached the implied warranty of merchantability and the implied warranty of fitness for a particular purpose.

421.    As a direct and proximate result of CCC and HMA's conduct, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to repair costs, rental costs, towing costs, finance charges, and the diminution in value of the Vehicle.

## COUNT ELEVEN – Fraudulent Misrepresentation
### (Against HMA, BMSC, and BHCC)

422.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

423.    HMA, BMSC, and BHCC made false representations of fact to Plaintiff, including but not limited to, telling Plaintiff that the Vehicle was not covered under the applicable warranty, when in fact it was.

424.    Specifically, on March 23, 2023, at or about 12:10 PM, an agent or employee of BHCC, located in Hyannis, Massachusetts, stated to Plaintiff that the Vehicle's engine was

ineligible for replacement under HMA's lifetime warranty because it did not have the required software update issued under Service Campaign 953.

425.    This representation was materially false because HMA's own publicly available policy (DBP, issued April 15, 2022) expressly eliminated Service Campaign 953 as a prerequisite for warranty coverage under TXXI. At the time of this statement, BHCC—as an authorized Hyundai dealer—had received DBP and related training materials instructing that coverage applied to vehicles exhibiting a no crank/no start condition related to connecting rod bearing wear **regardless of software update status**.

426.    This misrepresentation was not an isolated error but reflects a corporate policy or practice, as evidenced by BHCC's own counsel reiterating the false requirement in a formal written response to Plaintiff's demand letter nearly a year after the engine was replaced. In its response, BHCC stated: "In fact, when the vehicle was brought to Balise [on March 15, 2024], you were informed that Hyundai could deny the warranty repairs due to the open 2018 Recall# 953."

427.    HMA, BMSC, and BHCC knew that this representation was false when it was made and intended to deceive Plaintiff to avoid servicing his car under the warranty.

428.    BHCC actively concealed the existence of DBP by failing to disclose it during the March 23 call despite Plaintiff's specific inquiry about warranty requirements.

429.    Plaintiff reasonably and justifiably relied on this false representation when he canceled further repairs, did not reassert his warranty claim until 2024, and incurred rental car expenses.

430.    Had HMA, BMSC, and BHCC disclosed TXXI's actual terms, Plaintiff would have immediately demanded warranty coverage.

431.    As a direct and proximate result of his justifiable reliance on this misrepresentation, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to rental car costs, 362 days of lost use of the Vehicle, the diminished value of the Vehicle, and insurance surcharges from the resulting coverage lapse.

**COUNT TWELVE – Negligent Misrepresentation**
**(Against HMA, BMSC, and BHCC)**

432.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

433.    HMA, BMSC, and BHCC made false representations of fact to Plaintiff, including but not limited to, telling Plaintiff that the Vehicle was not covered under the applicable warranty, when in fact it was.

434.    HMA, BMSC, and BHCC knew or should have known that this representation was false when it was made and failed to take reasonable steps to determine the truth or falsity of the representation.

435.    Plaintiff reasonably and justifiably relied on this false representation when he canceled further repairs, did not reassert his warranty claim until 2024, and incurred rental car expenses.

436.    As a direct and proximate result of his justifiable reliance on this misrepresentation, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to rental car costs, 362 days of lost use of the Vehicle, the diminished value of the Vehicle, and insurance surcharges from the resulting coverage lapse.

**COUNT THIRTEEN – Negligent Supervision, Retention, Training, and Hiring**
**(Against BHCC and BMSC)**

437.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

438.    BHCC employed a service manager, Karon Canica, from approximately January 2019 to August 2024. Canica had zero prior experience as an automotive service manager. Before joining BHCC, Canica worked exclusively as an account executive for a human resources consulting company. BHCC and BMSC ("Balise Defendants") knew or should have known that this background rendered Canica unqualified to interpret complex manufacturer bulletins, including the DBP, train staff on warranty protocols, or oversee safety-critical engine defect claims.

439.    The Balise Defendants had a duty to ensure that their employees were adequately trained and able to perform their basic job requirements.

440.    The Balise Defendants breached this duty by failing to ensure that Canica was capable of supervising complex Hyundai warranty determinations, in light of her lack of automotive service management experience. The Balise Defendants failed to provide Canica with necessary specialized training, failed to implement adequate oversight of her department's warranty decisions, and failed to reassign her or otherwise mitigate the foreseeable risk of misrepresentation to consumers like Plaintiff.

441.    As a result of the Balise Defendants' failure to properly train and supervise Canica and other employees, Plaintiff was harmed when a Balise employee denied his warranty claim. The erroneous denial of a warranty claim was a direct and foreseeable result.

442.    As a direct, proximate, and foreseeable result of the Balise Defendants' breach, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to rental car expenses and damage to the Vehicle.

**COUNT FOURTEEN – Violation of Mass. Gen. Laws ch. 93A, § 9**
**(Against CAC)**

443.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

444.    CAC is a person engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A at the time of its unfair and deceptive activity.

445.    Specifically, CAC at the time of its unfair and deceptive conduct had and continues to have as its business the business of providing financing for used motor vehicle purchases, which it conducts through a controlled network of dealers using its proprietary software and lending model.

446.    CAC's acts and conduct in trade or commerce constitute unfair and deceptive acts and practices as part of its systematic business of originating, purchasing, and servicing subprime auto loans in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 9.

447.    For example, CAC's violations include, but are not limited to:

(a)    Originating and attempting to collect on a usurious loan by concealing substantial finance charges within the principal, resulting in an effective APR of at least 54.34%, far exceeding the 21% legal maximum;

(b)    Systematically failing to make accurate TILA disclosures by misstating the Finance Charge, Amount Financed, and Annual Percentage Rate;

(c)    Utilizing and providing to dealers a deceptive electronic signature process that prevents meaningful consumer review of complex loan documents and facilitates the fraudulent affixation of signatures;

(d)    Unilaterally and deceptively converting Plaintiff's account from a pre-computed to a riskier interest-bearing structure without notice or consent;

81

(e)    Designing, controlling, and providing financial incentives for a business model that encourages and enables its dealer network to engage in predatory and deceptive sales practices;

(f)    Failing to take meaningful corrective action against its dealers despite knowledge of a pervasive pattern of consumer fraud, as evidenced by thousands of complaints;

(g)    Furnishing inaccurate and unverifiable information to consumer reporting agencies after receiving a formal dispute regarding the fraudulent and usurious debt;

(h)    Willfully refusing to release its unlawfully retained security interest in the Vehicle after a lawful demand, despite the underlying debt being void or voidable.

448.    CAC's unfair and deceptive acts and practices set forth above constitute willful and knowing violations of Mass. Gen. Laws ch. 93A, as evidenced by its business model designed for the systemic concealment of finance charges, training and incentives for dealers to deceptively inflate loans, failure to act on thousands of consumer complaints regarding its core practices, refusal to release its security interest after formal notice of the loan's illegality, and continued furnishing of inaccurate credit data post-dispute.

449.    As a direct and proximate result of CAC's violations of Mass. Gen. Laws ch. 93A, § 9, Plaintiff has suffered damages in an amount to be determined at trial and continues to suffer harm.

450.    Plaintiff suffered concrete injury, including but not limited to payments on a usurious and fraudulently induced loan, overpayment for a defective vehicle and an unwanted VSC, loss of his converted $2,100.00 down payment, increased interest costs from the unilateral

account conversion, rental car expenses and other costs from the Vehicle's failure and title delays, and severe damage to his credit reputation and emotional distress.

451.    On March 29, 2023, Plaintiff sent CAC by USPS certified mail a written demand for relief pursuant to Mass. Gen. Laws ch. 93A, § 9 ("CAC Demand-1").

452.    CAC did not provide the relief demanded in CAC Demand-1. Instead, CAC responded by letter and declined to make any formal offer of settlement.

453.    On October 18, 2024, Plaintiff sent CAC and CAC's registered agent by USPS certified mail and first-class mail an additional written demand for relief pursuant to Mass. Gen. Laws ch. 93A, § 9 ("CAC Demand-2").

454.    CAC did not respond with a reasonable offer of settlement. CAC responded by letter dated November 1, 2024, in which it refused to acknowledge the loan as unenforceable, denied any inaccuracy in its credit reporting, and declined to release its security interest in the Vehicle. Critically, its response failed to address its liability as a holder of the Electronic RIC for claims and defenses assertable against CCC, or its status as a co-seller of the Vehicle under the terms of the Electronic RIC. While CAC offered a partial credit of $3,262.85, it explicitly defended the legality of the loan's APR and terms, thereby failing to address the core allegations of fraud, conversion, usury and hidden finance charges. This response was a refusal to provide the substantive relief demanded by Plaintiff.

455.    CAC's refusal to grant relief upon Plaintiff's demand was made in bad faith with knowledge or reason to know that its acts and practices complained of violated Mass. Gen. Laws ch. 93A.

456.    CAC's refusal was in bad faith, as it: willfully retained its security interest after Plaintiff's demand, despite knowing the underlying debt was usurious and fraudulently induced;

83

ignored its potential liability as a holder of the contract for claims assertable against the dealer; defended the legality of the loan's core terms despite their patent unconscionability; and made a token settlement offer that failed to address the fundamental illegality of the transaction and the extensive damages suffered.

457. In the alternative, CAC does not maintain a place of business or keep assets in Massachusetts and therefore no ch. 93A demand letter was required.

## COUNT FIFTEEN – Violation of Mass. Gen. Laws ch. 93A, § 9
### (Against CCC)

458. Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

459. CCC is a "Motor Vehicle Dealer" or "Dealer" within the meaning of 940 Mass. Code Regs. 5.01.

460. CCC is a person engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A at the time of its unfair and deceptive activity.

461. Specifically, CCC at the time of its unfair and deceptive conduct had and continues to have as its business the business of a used motor vehicle dealer.

462. CCC's acts and practices, as detailed herein, were performed in connection with CCC's business operations of marketing, selling, and financing used motor vehicles.

463. CCC's acts and conduct in trade or commerce constitute unfair and deceptive acts and practices in furtherance of its used motor vehicle sales business in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 9.

464. For example, CCC's violations include, but are not limited to:

(a)    Publishing vehicle advertisements that failed to disclose CCC's address, the Vehicle's stock number, its status as a "used" and "former leased" vehicle, and the requisite documentary preparation fee, in violation of 940 Mass. Code Regs. 5.02(1)–(3);

(b)    Failing to provide a copy of the contract documents to Plaintiff at the time of signing, in violation of 940 Mass. Code Regs. 5.04(1);

(c)    Utilizing motor vehicle purchase contracts that were devoid of essential terms, including the sale price and total contract price; failed to identify the Vehicle as a former leased car; and omitted the required statements regarding express and implied warranties, in violation of 940 Mass. Code Regs. 5.04(2);

(d)    Failing to provide Plaintiff with the promised express warranty documentation and by withholding copies of signed documents, including the Electronic Transaction Documents and E-Sign Declaration, in violation of 940 Mass. Code Regs. 5.04(3), (4);

(e)    Failing to promptly refund Plaintiff's deposit in full after failing to deliver a vehicle that conforms to the contract terms, in violation of 940 Mass. Code Regs. 5.04(9);

(f)    Failing to properly acknowledge in writing Plaintiff's lawful revocation of acceptance made pursuant to Mass. Gen. Laws ch. 106, § 2-608, and by refusing to provide a prompt refund of all amounts paid, in violation of 940 Mass. Code Regs. 5.04(14);

(g)    Failing to disclose the known, latent, and safety-critical Theta II engine defect, a fact which would have certainly caused Plaintiff not to purchase the Vehicle, in violation of 940 Mass. Code Regs. 3.16(2);

(h)    Making false statements regarding the Vehicle's condition and trim level, and by providing warranties that were illusory due to the Vehicle's inherent and catastrophic defects, in violation of 940 Mass. Code Regs. 3.08(2);

(i)    Engaging in an overall scheme that was oppressive and unconscionable, which combined the sale of a dangerously defective vehicle to Plaintiff with predatory financing and outright deception, in violation of 940 Mass. Code Regs. 3.16(1);

(j)    Violating 940 Mass. Code Regs. 3.16(3) and (4) by failing to comply with, and thereby committing *per se* violations of Mass. Gen. Laws ch. 93A under, numerous other statutes and regulations, including the Massachusetts Used Vehicle Warranty Law, Mass. Gen. Laws ch. 90, § 7N¼ (*via* § 7N¼(6)), and the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* (*via* § 2310(b) and § 45(a)(1)).

465.    CCC's unfair and deceptive acts and practices set forth above constitute willful and knowing violations of ch. 93A.

466.    CCC, through its manager Gravina-2, knowingly utilized a deceptive electronic signature process, affixing Plaintiff's "signature" to complex loan documents without his control or consent and then coercing him to sign a false declaration about that process. CCC further falsely represented that a costly add-on product was mandatory to secure financing, a deceptive practice designed to inflate the loan principal. Critically, CCC advertised and sold the Vehicle with a known, catastrophic engine defect, deliberately concealing this safety risk to complete a sale. This pattern of conduct—combining predatory lending tactics with the sale of a dangerously defective product—demonstrates a conscious and purposeful course of deception aimed at Plaintiff, evidencing a reckless disregard for the law and the rights of Plaintiff.

467.     As a direct and proximate result of CCC's violations of Mass. Gen. Laws ch. 93A, § 9, Plaintiff has suffered damages in an amount to be determined at trial.

468.     Plaintiff suffered concrete injury, including but not limited to the overpayment for a vehicle that was deceptively advertised and inherently defective; payments on a usurious loan; the loss of his converted down payment of $2,100.00; charges and interest paid on the fraudulently induced VSC; rental car expenses and other costs incurred due to the Vehicle's catastrophic failure and the delays in warranty repair; expenses and loss of use from the unreasonable delay in transferring the Vehicle's title; severe damage to his credit standing, reputation, and credit score; and significant emotional distress, anxiety, and frustration.

469.     On March 29, 2023, Plaintiff sent CCC by USPS certified mail a written demand for relief pursuant to Mass. Gen. Laws ch. 93A, § 9 ("CCC Demand-1").

470.     CCC did not properly and timely respond to CCC Demand-1. Although CCC subsequently claimed to have sent a response within the 30-day statutory period, Plaintiff never received CCC's response because it was misdirected to another individual engaged in a legal dispute with CCC.

471.     On September 25, 2024, Plaintiff sent CCC by USPS certified mail and first-class mail an additional written demand for relief pursuant to Mass. Gen. Laws ch. 93A, § 9 ("CCC Demand-2"). CCC Demand-2 included rental car expense documentation from Avis and Hertz.

472.     CCC did not provide the relief demanded in CCC Demand-2. Instead, CCC, through its counsel, responded by letter dated October 8, 2024, in which it declined to make any formal offer of settlement. CCC maintained its position that Plaintiff "did not suffer any cognizable harm, statutory violation, or regulatory violation" and that its actions were neither

unfair nor deceptive. This response constituted a refusal to provide the demanded relief and was not a reasonable offer of settlement, as it offered no compensation to Plaintiff.

473.    On October 15, 2024, Plaintiff sent CCC's counsel by USPS certified mail, USPS first-class mail, and email an additional written demand for relief pursuant to Mass. Gen. Laws ch. 93A, § 9 ("CCC Demand-3").

474.    CCC did not respond to CCC Demand-3.

475.    On February 27, 2025, Plaintiff, through counsel, sent CCC by USPS certified mail an additional written demand for relief pursuant to Mass. Gen. Laws ch. 93A, § 9 ("CCC Demand-4"). CCC Demand-4 contained a "formal rejection of acceptance of non-compliant goods under the Uniform Commercial Code" by Plaintiff.

476.    CCC did not provide the relief demanded in CCC Demand-4. Instead, CCC, through its counsel, responded by letter dated March 3, 2025, which constituted a final, bad-faith refusal to make any settlement offer. The letter stated that CCC's position "has not changed," reaffirmed its denial that Plaintiff suffered any "cognizable harm" or that its actions were "unfair" or "deceptive," and declared that it "is under no obligation to offer a monetary settlement and declines to do so." CCC's response to CCC Demand-4 did not acknowledge Plaintiff's revocation of his acceptance of the Vehicle made pursuant to Mass. Gen. Laws ch. 106, § 2-608.

477.    CCC's refusal to grant relief upon Plaintiff's multiple demands, sent over a span of nearly two years, was made in bad faith with knowledge or reason to know that its acts and practices complained of violated Mass. Gen. Laws ch. 93A. This is demonstrated by its repeated, blanket denials of Plaintiff's detailed demands without any substantive investigation, its conscious use of a deceptive electronic signature process and false statements regarding

mandatory add-on products, and its willful concealment of a known, catastrophic safety defect. CCC's refusal to provide a reasonable settlement, despite its knowing commission of these deceptive acts and extortionate business practices, was a willful and deliberate choice to retain the ill-gotten profits of its unlawful scheme.

### COUNT SIXTEEN – Violation of Mass. Gen. Laws ch. 93A, § 9
### (Against HMA)

478.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

479.    HMA is a person engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A at the time of its unfair and deceptive activity.

480.    Specifically, HMA at the time of its unfair and deceptive conduct had and continues to have as its business the design, importation, distribution, marketing, sale, and warranting of Hyundai-branded motor vehicles in the United States, including throughout Massachusetts.

481.    HMA's acts and practices, as detailed herein, were performed in the course of its business operations and in connection with its role as the national sales, marketing, distribution, and warranty entity for Hyundai vehicles in the United States. HMA exercises direct control over its authorized dealerships, including BHCC, and is the named warrantor on vehicles such as Plaintiff's.

482.    HMA's acts and conduct in trade or commerce constitute unfair and deceptive acts and practices in furtherance of its motor vehicle manufacturing, distribution, and warranty business in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 9.

483.    For example, HMA's violations include, but are not limited to:

(a)    Designing, manufacturing, and distributing the 2011 Hyundai Sonata with a known, catastrophic, and safety-critical defect in its 2.4-liter Theta II engine, which it knowingly concealed from Plaintiff and the public, and then failing to provide prompt and effective warranty relief for this defect;

(b)    Issuing a written warranty (Extension TXXI) that promised a lifetime of coverage for the defective engine, but then, through its authorized agent BHCC, falsely and deceptively denying Plaintiff's valid warranty claim by misrepresenting that a superseded software update (Service Campaign 953) was a prerequisite for coverage, despite HMA's own "Dealer Best Practice" guidance having eliminated that requirement;

(c)    Failing to provide prompt and adequate written notice of the known engine defect to Plaintiff, a known owner of the affected vehicle, as required by 940 Mass. Code Regs. 5.03(5), thereby depriving him of critical safety information and the opportunity to seek a timely remedy;

(d)    Violating the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*.

484.    HMA's unfair and deceptive acts and practices set forth above constitute willful and knowing violations of Mass. Gen. Laws ch. 93A.

485.    HMA's violations were willful and knowing, as evidenced by its long-standing, corporate-level awareness of the catastrophic Theta II engine defect, which was the subject of a major class action settlement, numerous NHTSA investigations, and high-profile recalls. Despite this knowledge, HMA engaged in a pattern of conduct designed to delay, avoid, and minimize its warranty obligations, including but not limited to: (a) failing to respond for nearly four months to Plaintiff's HMA Demand-2, and then responding with an irrelevant and inapplicable communication from the "Hyundai Class Action Settlement Center"; and (b) systematically

replacing defective Theta II engines with equally defective remanufactured Theta II engines, a purported "remedy" that it knew or should have known would inevitably fail and continue to pose a safety risk, thereby perpetuating the cycle of consumer harm for its own financial benefit.

486.    As a direct and proximate result of HMA's violations of Mass. Gen. Laws ch. 93A § 9, Plaintiff has suffered damages in an amount to be determined at trial.

487.    On March 29, 2023, Plaintiff sent HMA by USPS certified mail a written demand for relief pursuant to Mass. Gen. Laws ch. 93A § 9 ("HMA Demand-1").

488.    HMA did not respond to HMA Demand-1.

489.    On September 24, 2024, Plaintiff sent HMA by USPS certified mail and email a an additional written demand for relief pursuant to Mass. Gen. Laws ch. 93A § 9 ("HMA Demand-2").

490.    HMA did not properly and timely respond to HMA Demand-2.

491.    HMA's refusal to grant relief upon Plaintiff's demand was made in bad faith with knowledge or reason to know that its acts and practices complained of violated Mass. Gen. Laws ch. 93A.

492.    In the alternative, HMA does not keep assets in Massachusetts and therefore no ch. 93A demand letter was required.

## COUNT SEVENTEEN – Mass. Gen. Laws ch. 93A, § 9
### (Against HMMA)

493.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

494.    HMMA is a person engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A at the time of their unfair and deceptive activity.

495.    HMMA at the time of its unfair and deceptive conduct had and continues to have as its business the design, engineering, and manufacture of Hyundai-branded motor vehicles and their component parts for distribution and sale throughout the United States, including in Massachusetts.

496.    HMMA's acts and conduct in trade or commerce constitute unfair and deceptive acts and practices in furtherance of its business in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 9.

497.    For example, HMMA's violations include, but are not limited to:

(a)    Designing, engineering, and manufacturing the 2.4-liter Theta II engine with known, catastrophic, and safety-critical defects in its connecting rod bearings and lubrication system, which it knowingly concealed from Plaintiff and the public;

(b)    Producing and supplying a remanufactured replacement engine for Plaintiff's Vehicle that contained the same inherent, un-remedied defects, thereby perpetuating the safety risk and ensuring future failure; and

(c)    Failing to issue adequate recalls or design changes to genuinely rectify the life-threatening defects in the engines it produced, despite its longstanding knowledge of the failures and associated safety risks.

498.    As a direct and proximate result of HMMA's violations of Mass. Gen. Laws ch. 93A § 9, Plaintiff has suffered damages in an amount to be determined at trial.

499.    HMMA does not maintain a place of business or keep assets in Massachusetts and therefore no ch. 93A demand letter was required.

**COUNT EIGHTEEN – Mass. Gen. Laws ch. 93A, § 9**
**(Against BMSC and BHCC)**

500.    Plaintiff repeats and realleges each preceding paragraph and incorporates them as though fully set forth herein.

501.    BMSC and BHCC are each a person engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A at the time of its unfair and deceptive activity.

502.    Specifically, BMSC at the time of its unfair and deceptive conduct had and continues to have as its business the ownership and operation of a large network of automotive dealerships. BHCC at the time of its unfair and deceptive conduct had and continues to have as its business the sale, service, and repair of new and used Hyundai vehicles as an authorized dealer for HMA.

503.    BMSC's and BHCC's acts and conduct in trade or commerce constitute unfair and deceptive acts and practices as part of their respective businesses in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 9.

504.    For example, BMSC's and BHCC's violations include, but are not limited to:

(a)    Fraudulently misrepresenting that the superseded Service Campaign 953 software update was a prerequisite for coverage under TXXI, despite having received and being bound by HMA's DBP guidance which had eliminated that requirement;

(b)    Failing to properly train, supervise, and oversee its service department personnel, including its unqualified service manager, leading to the systematic and erroneous denial of warranty claims for a known, safety-critical defect, thereby depriving consumers like Plaintiff of their warranty rights and exposing them to undue risk and expense;

(c)      Failing to perform warranty repairs in a timely and competent manner, as evidenced by the five-day delay in opening a repair order for Plaintiff's disabled Vehicle and the installation of a replacement engine that contained the same inherent, un-remedied defect, thereby providing a futile "repair" that perpetuated the safety risk; and

(d)      Engaging in a corporate practice and policy, through BMSC's control over BHCC, of intentionally misleading consumers about warranty coverage to manage claim volume and resource constraints, thereby placing corporate profit over consumer safety and contractual obligations.

505.    BMSC's and BHCC's unfair and deceptive acts and practices set forth above constitute willful and knowing violations of Mass. Gen. Laws ch. 93A.

506.    As a direct and proximate result of BMSC's and BHCC's violations of Mass. Gen. Laws ch. 93A § 9, Plaintiff has suffered damages in an amount to be determined at trial.

507.    On April 5, 2025, Plaintiff sent BHCC by USPS certified mail, USPS first-class mail, and email a written demand for relief pursuant to Mass. Gen. Laws ch. 93A § 9 ("BHCC Demand").

508.    BHCC did not respond to Plaintiff's BHCC Demand with a reasonable offer of settlement.

509.    On April 5, 2025, Plaintiff sent BMSC by USPS first-class mail a written demand for relief pursuant to Mass. Gen. Laws ch. 93A § 9 ("BMSC Demand"). On April 5, 2025, Plaintiff sent to James E. Balise, Jr. ("JEB"), president and registered agent of BMSC, a copy of the BMSC Demand by email. JEB opened the email containing the BMSC Demand at least 3 times between April 5, 2025, at 6:28 PM and April 6, 2025, at 10:20 AM.

510.    BMSC did not respond to Plaintiff's BMSC Demand.

511.    BMSC's and BHCC's refusal to grant relief upon Plaintiff's demand was made in bad faith with knowledge or reason to know that their acts and practices complained of violated Mass. Gen. Laws ch. 93A.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Enter a judgement in his favor;

B.    Award monetary relief, including, but not limited to, compensatory damages, consequential damages, punitive damages, special damages, emotional distress damages, and treble damages, in an amount to be determined at trial;

C.    Award attorneys' fees;

D.    Award costs of suit incurred herein;

E.    Enter a declaratory judgement that the Electronic RIC is void and unenforceable;

F.    Order CAC to release its security interest in the Vehicle and surrender the title;

G.    Order the dissolution of the Enterprise, pursuant to 18 U.S.C. § 1964(a); and

H.    Award any other such relief that this Court deems just and proper.


## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38.

Dated: October 30, 2025

Respectfully submitted,

Thomas Greve
Plaintiff, *Pro Se*
33 Dover Street
Cranston, RI 02920
401-449-3753
*thomgreve@gmail.com*