**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| THOMAS GREVE,<br><br>Plaintiff,<br><br>v.<br><br>CAPE COD CARZ LLC; RICHARD GRAVINA SR.; RICHARD GRAVINA JR.; WYNN'S EXTENDED CARE, INC.; HYUNDAI MOTOR AMERICA; BALISE MOTOR SALES COMPANY; and CAPE HY, INC., d/b/a Balise Hyundai of Cape Cod,<br><br>Defendants. | ) | Civil Action No. 1:25-CV-13178-AK |

**MEMORANDUM AND ORDER ON DEFENDANTS RICHARD GRAVINA SR., RICHARD GRAVINA JR., WYNN'S EXTENDED CARE, INC., AND HYUNDAI MOTOR AMERICA'S MOTIONS TO DISMISS**

**KELLEY, D.J.**

This action arises from the alleged fraudulent sale and repair of a used car. Plaintiff Thomas Greve, proceeding *pro se*, brings this lawsuit under federal and state law against multiple Defendants, alleging, *inter alia*, that they engaged in a scheme to defraud consumers with low credit scores through allegedly usurious auto loan terms in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act. He also alleges that various Defendants failed to comply with state and federal warranty, consumer protection, and fraud laws. Presently before the Court are Motions to Dismiss for Failure to State a Claim filed by Defendants Richard Gravina Sr. [Dkt. 26], Richard Gravina Jr. [Dkt. 27], Wynn's Extended Care, Inc. [Dkt. 35], and Hyundai Motor America ("HMA") [Dkt. 40]. Plaintiff did not file an opposition or otherwise

respond to Defendants' Motions.

While the Court acknowledges the significant practical hardships Plaintiff experienced as a result of Defendants' alleged conduct, Defendants' Motions are **GRANTED** as to Plaintiffs' federal claims, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## I. BACKGROUND

The following facts are drawn from the Complaint, documents fairly incorporated by reference in Complaint, and documents subject to judicial notice. See Squeri v. Mount Ida Coll., 954 F.3d 56, 61 (1st Cir. 2020) (quoting Lydon v. Local 103, Int'l Bhd. of Elec. Workers, 770 F.3d 48, 53 (1st Cir. 2014)). The Court assumes these facts are true on reviewing a motion to dismiss. See id.

### A. Credit Acceptance Corporation's Loan Servicing Practices

Defendant Credit Acceptance Corporation ("CAC") is a national automobile financing lender that partners with over 12,000 used car dealerships to offer vehicle loans to consumers. [Dkt. 1 ¶¶ 58-59]. Under CAC's financing program, a dealership sells a vehicle to a customer on credit using a retail installment contract ("RIC"). [Id.]. The RIC is immediately assigned to CAC, who then manages the customer's ongoing loan payments. [See id.].

To calculate a customer's loan terms, CAC generates a "CAC Score" for each customer based on their profit margin, as predicted by factors such as the customer's personal and financial information. [Id. ¶¶ 63-65]. Dealers then use CAC's proprietary loan calculation software to generate loan documents, which factors in the customer's CAC Score, the vehicle's price, the term of the loan, and add-ons. [Id. ¶ 65]. Dealers and customers then sign the documents using CAC's proprietary electronic signature software. [Id. ¶ 84]. Dealers receive a commission from CAC as a percentage of the loan amount. [See id. ¶ 69].

Notably, rather than tailoring to individual risk profiles like conventional lenders, CAC applies a uniform interest rate across all borrowers in the same state. [Id. ¶ 143]. CAC then offsets the risk by inflating the principal amount of the loan (e.g., through raising the vehicle's purchase price) without the borrower's knowledge. [Id. ¶¶ 143-51]. This allegedly creates a hidden finance charge: While the interest rate looks low on paper, applying it to an inflated principal generates the same high monthly payment as a high-interest loan. [Id. ¶ 152]. Because CAC implements this practice without the buyer's knowledge, they prevent low-credit buyers from accurately comparing loan options. [Id.].

Between January 2017 and August 2020, CAC received over 1,000 consumer complaints related to its add-on products, including complaints that dealers inaccurately represented that add-ons were required to secure a CAC loan. [Id. ¶ 161]. Over the same period, CAC received over 1,700 complaints from consumers about the electronic signature process, including 1,100 that specifically complained that the dealer refused to allow the borrower to control the mouse and keyboard while executing the documents. [Id. ¶ 163]. Finally, from October 2018 to March 2019, CAC received over 800 complaints from borrowers who did not receive a printed copy of their loan agreement from their dealer. [Id. ¶ 164].

**B. Plaintiff's Vehicle Purchase**

Defendants Richard Gravina Sr. and Richard Gravina Jr. own and operate Cape Cod Carz LLC ("CCC"), a used car dealership in Hyannis, Massachusetts. [Id. ¶¶ 9-11, 109]. CCC partners with CAC to service its loans. [See id.]. On or around October 16 and 19, 2021, CCC posted online advertisements for a 2011 Hyundai Sonata ("the Vehicle"), with a sales price of $10,995.00. [Id. ¶¶ 87-88]. Plaintiff Thomas Greve saw the advertisement, and on or about October 26, 2021, he went to CCC's location to inquire about purchasing the Vehicle. [Id. ¶ 94]. After a test drive, Plaintiff provided a $500 deposit to secure the purchase. [Id. ¶ 95]. Gravina Jr.

provided a signed receipt of the deposit, which specified that an additional payment of $4,600 was due upon delivery of the Vehicle ("Purchase Agreement"). [Id. ¶ 96]. Four days later, Plaintiff paid the balance and completed the sale. [Id. ¶¶ 98, 108]. At the time, CCC told Plaintiff that the sale included a mandatory add-on of a vehicle service contract ("VSC") for repairs and replacement parts, serviced by Defendant Wynn's Extended Care ("Wynn's). [Id. ¶ 119]. The VSC add-on price was $1,586. [Id. ¶ 181]. In total, the value of the sale as reflected in the electronic RIC was $20,989.63. [Id.].

During the sale, CCC provided three documents to Plaintiff to memorialize the transaction, which Plaintiff signed in wet ink: a Purchase Contract, a Bill of Sale, and CAC's electronic signature ("e-signature") acknowledgement form ("E-Signature Declaration"). [Id. ¶¶ 99, 123]. After Plaintiff signed these forms, Gravina Jr. allegedly affixed Plaintiff's e-signature to three additional electronic documents: CAC's disclosure form, the RIC (which Plaintiff had received a physical copy of a week prior), and a contract for the VSC add-on. [Id. ¶ 128]. According to Plaintiff, this was possible because CCC's e-signature software does not require the signer to draw their signature using the computer's mouse or trackpad; instead, the signer types in their name or initials, and the contract displays the signature as digital text. [Id.]. Thus, Plaintiff's signature appears on the three electronic documents as his typed name or initials.

Two weeks after he completed the car purchase, Plaintiff received a letter from CAC informing him that the VSC was optional, contrary to Gravina Jr.'s representation during the transaction. [Id. ¶ 153]. CAC allowed Plaintiff the option of cancelling the VSC, which he accepted. [Id.]. However, CAC informed Plaintiff that to refund the VSC, his account would have to be converted from a pre-computed account into an interest-bearing account, which would

accrue daily interest on the unpaid balance of the loan. [Id. ¶ 156].

### C. Defective Engine and Warranty Issues

Approximately two and a half years after Plaintiff purchased the Vehicle, Plaintiff was driving on the highway when a loud noise suddenly emanated from the engine. [Id. ¶ 208]. The Vehicle stopped accelerating and power steering failed. [Id.]. Plaintiff pulled over to reach the breakdown lane, nearly colliding with a semi-truck. [Id.]. Unbeknownst to Plaintiff, the Vehicle's engine variety was widely known to contain manufacturing defects. [Id. ¶¶ 187-92]. The engine manufacturer, Hyundai, had previously extended warranty coverage for the engine under a class action settlement regarding the defect. [Id. ¶¶ 194, 197].

Two days after the incident, Plaintiff contacted Balise Motor Company ("Balise"), an auto dealer and collision repair center, to inquire about warranty coverage for the Vehicle's engine malfunction. [Id. ¶ 212]. Balise informed him that the Vehicle was ineligible for warranty because it lacked a certain software update. [Id. ¶ 213]. Plaintiff then sent a demand letter to Hyundai requesting that they repair or replace the defective engine and reimburse him for his expenses. [Id. ¶¶ 215-16]. Hyundai did not respond. [Id. ¶ 218]. As a result, Plaintiff cancelled the Vehicle's registration and resorted to car rentals and ride share, incurring approximately $20,000 in expenses. [Id. ¶¶ 218-19].

A year later, Balise informed Plaintiff that Hyundai had approved his warranty claim and that the Vehicle's engine would be replaced at Hyundai's expense. [Id. ¶ 223]. Balise offered Plaintiff a courtesy rental vehicle at no cost until they could complete the engine replacement. [Id. ¶ 224]. They also informed him that Hyundai would reimburse him up to $40 per day for rental expenses incurred prior to his warranty claim approval. [Id. ¶ 226]. However, Balise replaced the Vehicle's engine with a remanufactured Hyundai engine that had the same defect as the prior engine. [Id. ¶¶ 227, 230]. Plaintiff then sent a second demand letter to Hyundai. [Id.

¶ 231]. Several months later, Hyundai responded that Plaintiff was ineligible for reimbursement because he purchased the Vehicle after the class action settlement claims deadline. [Id. ¶¶ 234-35].

**D. Procedural History**

On October 30, 2025, Plaintiff filed this action against CAC, CCC, Gravina Sr., Gravina Jr., Mary Ellen Gravina, Wynn's, HMA, Hyundai America Technical Center, Inc. ("HATC"), Hyundai Motor Manufacturing Alabama, LLC ("HMMA"), Balise, and Cape Hy, Inc. [Dkt. 1]. The Complaint asserts eighteen counts: (1-2) violations of the RICO Act against CAC, CCC, Gravina Sr., Gravina Jr., Mary Ellen Gravina, and Wynn's; (3) fraud or deceit in the sale of personal property in violation of Mass. Gen. L. ch. 231, § 85J, against CAC, CCC, Gravina Sr., Gravina Jr., and Wynn's; (4) violation of the Truth in Lending Act, 15 U.S.C. § 1601, and the Consumer Credit Cost Disclosure Act, Mass. Gen. L. ch. 140D, against CAC; (5) violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x, and Consumer Reporting Act, Mass. G.L. ch. 93, §§ 50-56, against CAC; (6) defamation against CAC; (7) invasion of privacy in violation of Mass. Gen. L. ch. 214, § 1B, against CAC; (8) breach of the implied warranty of merchantability in violation of Mass. Gen. L. ch. 106, § 2-314, against CCC, HMA, HATC, and HMMA; (9) breach of the implied warranty of fitness for a particular purpose in violation of Mass. Gen. L. ch. 106, § 2-315, against CCC, HMA, HATC, and HMMA; (10) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, against CCC and HMA; (11) fraudulent misrepresentation against HMA, Balise, and Cape Hy; (12) negligent misrepresentation against HMA, Balise, and Cape Hy; (13) negligent supervision against Balise and Cape Hy; and (13-18) violations of Mass. Gen. L. ch. 93A, § 9 ("Chapter 93A"), against CAC, CCC, HMA, HMMA, Balise, and Cape Hy.

On March 3, 2026, CCC moved to stay the action pending arbitration, and on March 12,

2026, CAC moved to compel arbitration and to dismiss. [Dkts. 24; 33]. Gravina Sr., Gravina Jr., Mary Ellen Gravina, and Wynn's moved to dismiss for failure to state a claim. [Dkts. 25; 26; 27; 35]. The three Hyundai Defendants moved to dismiss for lack of personal jurisdiction and for failure to state a claim. [Dkt. 40]. Plaintiff then voluntarily dismissed his claims against Mary Ellen Gravina, HATC, and HMMA. [Dkts. 25; 56; 66]. Balise and Cape Hy filed an Answer. The Court held a scheduling conference with the parties on July 21, 2026, informing the parties that it would take all pending Motions under advisement. [See Dkt. 61]. The same day, the Court entered a discovery schedule as to Balise and Cape Hy only. [See Dkt. 60]. On October 20, 2026, the Court granted CAC's Motions to Compel Arbitration and dismissed it as a party to this action. [Dkt. 69]. On November 2, 2026, the Court granted CCC's Motion to Stay Pending Arbitration and thus stayed all claims against it. [Dkt. 72].

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to state a claim for relief that is "plausible on its face" and actionable as a matter of law. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the complaint to distinguish factual allegations from conclusory legal statements. Id. Factual allegations must be accepted as true, while legal conclusions are not entitled to credit. Id. A court may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted). Dismissal is

appropriate when the complaint fails to allege a "plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 559). The Court may, "for reasons other than those advanced by Defendants, . . . dismiss the claims asserted against the individual defendants." S.S. by S.Y. v. City of Springfield, 146 F. Supp. 3d 414, 426 (D. Mass. 2015).

## III. DISCUSSION

Presently before the Court are Motions to Dismiss filed by Gravina Jr., Gravina Sr., Wynn's, and HMA. Defendants move to dismiss all claims against them for failure to state a claim. As relevant here, the claims include RICO and state fraud claims against Gravina Sr., Gravina Jr., and Wynn's; and Magnuson-Moss Warranty Act, implied warranty of merchantability, implied warranty of fitness, fraudulent and negligent misrepresentation, and Chapter 93A claims against HMA. Plaintiff did not oppose or otherwise respond to Defendants' Motions. As explained below, the Court finds that the Complaint fails to plausibly allege its only two federal claims—i.e., a RICO claim against Gravina Sr., Gravina Jr., and Wynn's, and a Magnuson-Moss Warranty Act claim against HMA—and the circumstances of this case do not warrant exercising supplemental jurisdiction over the remaining state-law claims.

### A. Civil RICO Claims (Counts 1 and 2)

In Counts 1 and 2, Plaintiff brings RICO claims against Wynn's, Gravina Sr., and Gravina Jr., under both direct and conspiracy theories of liability. See 18 U.S.C. §§ 1962(c), (d). Under the RICO statute, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a RICO claim, a plaintiff must allege three elements: "(1) conduct, (2) of an enterprise, (3) through

[either] a pattern . . . of racketeering activity," Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 233 (1st Cir. 2003) (quotations omitted), or "a single collection of an unlawful debt," United States v. Weiner, 3 F.3d 17, 24 (1st Cir. 1993); Home Orthopedics Corp. v. Rodriguez, 781 F.3d 521, 528 (1st Cir. 2015).

While RICO is well known for criminal prosecutions, the statute also provides a private civil right of action for individuals aggrieved by the alleged enterprise. See 18 U.S.C. § 1964(c); Rodriguez, 781 F.3d at 527. However, the First Circuit has cautioned that civil RICO claims "must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 20 (1st Cir. 2000); see also Miranda v. Ponce Fed. Bank, 948 F.2d 41, 44 (1st Cir. 1991) ("[I]n cases alleging civil RICO violations, particular care is required to balance the liberality of the Civil Rules with the necessity of preventing abusive or vexatious treatment of defendants . . . . Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device. The very pendency of a RICO suit can be stigmatizing and its consummation can be costly . . . ."). Accordingly, "courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." Figueroa Ruiz v. Alegria, 896 F.2d 645, 650 (1st Cir. 1990).

In the present action, Plaintiff alleges that the Gravinas and Wynn's engaged in a coordinated scheme with CAC and CCC to deceptively market and sell used vehicles to subprime consumers like Plaintiff by offering ostensibly attractive but allegedly usurious financing terms that maximize profits for the dealers and CAC at consumers' expense. Plaintiff further alleges that the Gravinas employed a fraudulent electronic signature process and misrepresented the necessity of purchasing add-ons. Plaintiff contends that this conduct

constitutes racketeering activity—specifically, extortion, wire fraud, interference with commerce by threats in violation of the Hobbs Act, and money laundering—and the collection of unlawful debt.[1]

Even accepting Plaintiff's factual allegations as true and drawing all reasonable inferences in his favor, the Complaint fails to state a plausible claim under RICO. Specifically, the Complaint fails to adequately allege either (1) the existence of a RICO enterprise or (2) a pattern of racketeering activity or the collection of an unlawful debt. Each deficiency independently warrants dismissal of Plaintiff's RICO claims.

**1. Existence of an Enterprise**

The RICO statute defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The "enterprise" requirement can be satisfied under one of two theories. First, under the "victim-enterprise theory," a plaintiff must establish that "a legitimate enterprise . . . was victimized by a racketeering scheme." See Metro. Prop. & Cas. Ins. Co. v. Savin Hill Fam. Chiropractic, Inc., 266 F. Supp. 3d 502, 520 (D. Mass. 2017) (quoting In re Pharm. Indus. Average Wholesale Price Litig., 263 F. Supp. 2d 172, 185 (D. Mass. 2003)). Alternatively, a plaintiff can establish an enterprise that is "associated-in-fact" by proving that a group of individuals or corporations, although not a legal entity, have an "ongoing organization, formal or informal," with members "function[ing] as a continuing unit." Boyle v. United States, 556 U.S. 938, 945 (2009) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). Plaintiff pursues the latter theory.

---

[1] The Complaint also includes mail fraud in its list of alleged racketeering activity. [Dkt. 1 ¶¶ 298-99]. However, the Complaint identifies only statements made by CAC in connection with that claim, and CAC is not a party to these Motions. The Court thus excludes that claim from the analysis here.

An associated-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose." Id. at 946. To determine whether an association-in-fact enterprise has been plausibly alleged, the First Circuit instructs courts to consider several factors: (1) whether the associates have a common purpose, (2) whether there is "systematic linkage, such as overlapping leadership, structured or financial ties or continuing coordination," (3) whether there is a common communication network for sharing information on a regular basis, (5) whether the associates hold meetings and sessions where important discussions take place, (6) whether the associates wear common colors, signs or insignia to make the group identifiable, and (7) whether the group conducted common training and instruction. Libertad v. Welch, 53 F.3d 428, 443 (1st Cir. 1995); United States v. Patrick, 248 F.3d 11 (1st Cir. 2001). The existence of similar goals and methods, without more, does not establish the existence of a RICO enterprise. See Libertad, 53 F.3d at 443.

Here, Plaintiff alleges that the Gravinas, Wynn's, CAC, and CCC operate as an associated-in-fact enterprise that shares the common purpose of "systematically generat[ing] exorbitant profits by originating and servicing predatory motor vehicle retail installment contracts through a coordinated, multi-faceted scheme to defraud a targeted class of vulnerable, subprime consumers." [Dkt. 1 ¶ 271]. He alleges that the relationships among these Defendants "were created by formal agreements, financial incentives, and a high degree of interdependence and coordination." [Id. ¶ 273]. Specifically, Plaintiff alleges that CAC trains dealers like CCC to market its loan products in ways that exploit vulnerable customers [id. ¶¶ 60, 110-11, 119-21, 151]; that both CAC and dealers ultimately benefit from the sale of add-ons [id. ¶¶ 73. 116]; that all dealers are required to use CAC's fraudulent electronic document and signature process [id.

¶¶ 80-83]; and that dealers are incentivized to steer consumers toward CAC's financing rather than competing alternatives because CAC withholds payment until dealers secure a minimum number of customer loan agreements [id. ¶¶ 61, 273-76].

Even accepting these allegations as true and drawing reasonable inferences in Plaintiff's favor, the Complaint does not plausibly allege that Defendants operated as a coherent enterprise with a single, common purpose. Rather, the allegations describe commercial relationships among entities seeking to maximize their respective profits through mutually beneficial—but ultimately independent—transactions. See Wade Park Land Holdings v. Kalikow, 522 F. Supp. 3d 1341, 1351 (S.D.N.Y. 2022) (noting that the plaintiff's allegations did not "plausibly support the inference that the defendants were collectively trying to make money . . . by fraud . . . as opposed to the obvious alternative explanation, that they were simply trying to make money."). CAC provides financing, dealers like CCC sell vehicles and arrange financing, and add-on providers like Wynn's supply add-on products. That those entities might benefit from the same transactions and have contractual arrangements or financial incentives encouraging them to do business together does not, without more, establish that they shared a common purpose to conduct an enterprise distinct from their ordinary commercial objectives. Nor does the existence of unilateral training programs held by CAC for dealers and sales incentives, standing alone, plausibly establish the degree of coordination or communication necessary to infer that Defendants functioned under a "common communication network, decision-making process, or organizational structure." Pharma. Indus. Average, 263 F. Supp. 2d at 184.

This conclusion includes Plaintiff's allegations concerning Gravina Jr.'s alleged misrepresentation regarding the VSC add-on product. Plaintiff appears to contend that CAC trains dealers to misrepresent add-on products as mandatory, thereby inducing consumers to

purchase products they otherwise would decline, and then structures the loan-refund process to make cancellation financially disadvantageous by requiring consumers to transition from a pre-computed account to an interest-bearing account. But the Complaint, as described, does not allege sufficient facts to support that inference. The existence of a dealer training program, coupled with financial incentives to sell add-on products, does not itself establish that CAC instructed dealers to make false representations or that Defendants coordinated the alleged misrepresentations and subsequent refund process as components of a common fraudulent scheme. Compare Metro. Prop. & Cas. Ins. Co., 266 F. Supp. 3d at 523 (finding that a plaintiff can sufficiently establish an association-in-fact enterprise if they describe each defendants role in the scheme and allege connections that go beyond ordinary business associates), with Nelson v. Nelson, 833 F.3d 965, 968 (8th Cir. 2016) (finding that allegations showing defendants performing "various discrete tasks within their various fields of expertise" only proves that defendants were "pursuing their own ends separately" and is not sufficient to prove that they functioned as a continuing unit); see Douglas v. Hirshon, 63 F.4th 49, 57 (1st Cir. 2023) (finding that allegations against defendants that they participated in real estate transactions, benefited financially, and acquired a mortgage were not "inconsistent with the conclusion that [the defendants] are ordinary lenders or providers of service").

In short, the Complaint fails to plausibly establish that the Gravinas, Wynn's, CAC, and CCC acted as a coherent unit. Though Defendants sought to increase their profits, CAC's allegedly predatory interest rates, CCC's marketing and sales tactics, and Wynn's provision of add-on products support, at most, commercially interdependent entities whose financial incentives align in some respects. RICO is not intended to "penalize parallel, uncoordinated fraud." Metro. Prop. & Cas. Ins. Co., 266 F. Supp. 3d at 523 (quoting United Food & Com.

Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co., 719 F.3d 849, 855 (7th Cir. 2013)). These allegations, which "show different subsets of [a] group pursuing their own ends separately," are insufficient to establish an association-in-fact enterprise. Id. (quoting Nelson, 833 F.3d at 968). Thus, Plaintiff fails to plead an enterprise, as required to sustain a RICO claim.

**2. Pattern of Racketeering Activity or Collection of Unlawful Debt**

In addition to failing to plausibly allege the existence of an enterprise, the Complaint fails to adequately establish either a pattern of racketeering activity or the collection of unlawful debt. The RICO statute encompasses a broad range of predicate offenses as "racketeering activity," including extortion, counterfeiting, embezzlement, witness tampering, trafficking, and mail and wire fraud, as well as certain state-law offenses such as murder, gambling, and arson. 18 U.S.C. § 1961(1)(B); Lu v. Canton Corp., No. 15-CV-10088, 2015 WL 13697141, at *6 (D. Mass. May 13, 2015). Plaintiff advances four theories of racketeering against Defendants: extortion, wire fraud, interference with commerce by threats in violation of the Hobbs Act, and money laundering. Separately, Plaintiff alleges that Defendants engaged in the collection of unlawful debt. None of these theories are plausibly alleged.

**a. Extortion**

Plaintiff first argues that Defendants committed extortion because Gravina Jr. represented that Wynn's add-on product was necessary to obtain financing, and he allegedly threatened to cancel the sale if Plaintiff refused to sign the electronic documents. [Dkt. 1 ¶ 295]. Plaintiff contends that the threatened cancellation put his deposit at risk, thereby threatening financial injury. [See id.].

Under federal law, extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under

color of official right." 18 U.S.C. § 1951(b)(2). The Massachusetts extortion statute similarly defines extortion as "threaten[ing] an economic injury to another . . . with intent to compel that person to do any act, involving the use or disposition of anything of value against his will . . . ." Mass. G.L. c. 271, § 39(b).

Here, Plaintiff's allegations do not plausibly establish extortion. The Complaint alleges, at most, that Gravina Jr. explained to him that failing to sign documents to effectuate a sale would result in the cancellation of that transaction. Plaintiff has not shown that this was a threat to gain something from him through the use of "force, violence, or fear." The fact that Plaintiff would lose his deposit, thus constituting an economic injury, would merely be the consequence of failing to complete the transaction, not a threat.

**b. Wire Fraud**

Next, Plaintiff alleges that Defendants committed wire fraud by publishing deceptive online advertisements for the Vehicle; transmitting his fraudulent electronic RIC over the internet; and processing his down payment checks through the interstate banking system. [Dkt. 1 ¶¶ 301-05].

To plead a wire fraud claim, Plaintiff must demonstrate: (1) a scheme to defraud or obtain money or property by means of false or fraudulent pretenses; (2) Defendants' knowing and willful participation in this scheme with the intent to defraud, or to obtain money or property by means of false or fraudulent pretenses; and (3) the use of the U.S. mail in furtherance of this scheme. McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 790 (1st Cir. 1990). Because wire fraud claims are predicated on acts of fraud, Plaintiff must meet the heightened pleading requirements under Federal Rule of Civil Procedure 9(b), which requires "specify[ing] the false statements and by whom they were made." N. Am. Cath. Educ. Prog. Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009) (quoting Greenstone v. Cambex Corp., 975 F.2d 22, 25

(1st Cir. 1992)).

Here, the Complaint's allegations are insufficient under Rule 9(b). Plaintiff does not identify any statements or actions taken via wire made specifically by Wynn's, Gravina Jr., or Gravina Sr. Instead, the Complaint attributes statements only to CCC and CAC, which are separate corporate defendants. These acts are not imputable to Gravina Jr., Gravina Sr., or Wynn's. See Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1381 (11th Cir. 1997) (holding that lumping defendants together rendered RICO claims subject to dismissal "for failure to plead fraud with the requisite specificity as to each of the Defendants under Rule 9(b)").

**c. Interference with Commerce by Threats**

Plaintiff next alleges that Defendants committed interference with commerce by threats in violation of the Hobbs Act, 18 U.S.C. § 1951. Specifically, he contends that Gravina Jr. and Gravina Sr. fraudulently inflated his loan through mispresenting the necessity of the VSC add-on product, and then caused CAC to threaten to unlawfully convert and repossess his Vehicle when he failed to repay the loan. [Dkt. 1 ¶¶ 307-12]. He alleges that at the time of repossession, his Vehicle was in Rhode Island, and under Rhode Island law, a creditor may not repossess a vehicle without the owner's consent. See R.I. Gen. L. § 6-51-4(a),

The Hobbs Act "prohibits interference with interstate commerce through robbery or extortion," or attempting or conspiring to do so. United States v. Brissette, 919 F.3d 670, 672 (1st Cir. 2019) (cleaned up); see 18 U.S.C. § 1951(a). A showing of extortion under the Hobbs Act requires: "(i) that the defendant induced someone to part with property; (ii) that the defendant knowingly and willfully did so by extortionate means; and (iii) that the extortionate transaction affected interstate commerce." United States v. Cruzado-Laureano, 404 F.3d 470, 480 (1st Cir. 2005).

Plaintiff fails to show that Gravina Jr.'s and Gravina Sr.'s actions during the sale of his vehicle were extortionate under the meaning of the Hobbs Act. Merely misrepresenting the necessity of add-on products does not equate to the wrongful use of fear, violence, or force within the meaning of the Hobbs Act. Similarly, CAC's collection of the Vehicle was, at most, the adverse consequences associated with a vehicle loan; Plaintiff fails to explain how the collection alone was induced through the "wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2).

**d. Money Laundering**

Plaintiff next alleges that Defendants engaged in money laundering by obtaining funds through servicing fraudulent auto loans, using those funds to purchase additional vehicle inventory, and then selling those vehicles through the allegedly predatory scheme. He specifically identifies mail and wire fraud as the "specified unlawful activity" from which the proceeds were allegedly derived. See 18 U.S.C. §§ 1956, 1957 (prohibiting monetary transactions of criminally derived property that exceeds $10,000 and is derived from specified unlawful activity). However, as explained above, Plaintiff fails to adequately plead fraud as to Wynn's, Gravina Jr., or Gravina Sr. Accordingly, his money laundering claim also fails.

**e. Collection of Unlawful Debt**

Finally, Plaintiff alleges that Gravina Jr. collected an unlawful debt by knowingly creating and submitting the electronic RIC to CAC, who then used that information to collect his loan payments. According to Plaintiff, after accounting for hidden finance charges, the actual interest rate on his loan was 54.34%, which is over double the 21% limit for auto loans in Massachusetts. [See Dkt. 1 ¶¶ 186, 321 (citing Mass. Gen. L. ch. 255B § 14B)].

The RICO statute defines an "unlawful debt" as a debt "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to

usury" and "which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal Law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6); see also Cannarozzi v. Fiumara, 371 F.3d 1, 4 (1st Cir. 2004) (quoting Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank, 755 F.2d 239, 248 (2d Cir. 1985)). Unlike for racketeering activity, which requires showing a pattern, "the collection of a single unlawful debt is enough" for this part of RICO. Weiner, 3 F.3d at 23. "At the same time, however, the statute does not reach the collection of a loan that is made occasionally and not as part of the 'business of lending money' at a usurious rate. Wade Park Land Holdings, LLC, 589 F. Supp. 3d at 376 (quoting Malvar Egerique v. Chowaiki, No. 19 CIV. 3110, 2020 WL 1974228, at *19 (S.D.N.Y. Apr. 24, 2020), vacated in part on other grounds sub nom. Weiss v. David Benrimon Fine Art LLC, No. 20-3842-CV, 2021 WL 6128437 (2d Cir. Dec. 28, 2021)), aff'd sub nom. In re Wade Park Land Holdings, LLC, No. 23-591-BK, 2024 WL 3024648 (2d Cir. June 17, 2024).

Here, Plaintiff fails to allege that Defendants "were in the business of lending money." Gravina Jr. and Gravina Sr. run CCC, which is a used car dealership; their only alleged connection to lending money is that they partner with lenders like CAC. Wynn's, similarly, is a VSC and extended warranty provider; there is no allegation that they are in the business of providing loans. Accordingly, Plaintiff fails to allege the collection of unlawful debt.

**3. Conspiracy**

In addition to direct liability claims under RICO, Plaintiff also alleges that Gravina Sr., Gravina Jr., and Wynn's engaged in a RICO conspiracy with CCC and CAC. To state a claim for RICO conspiracy, a plaintiff must allege "the same elements of a RICO claim, plus allegations that each RICO co-conspirator 'knowingly joined the conspiracy and involved himself or herself, directly or indirectly, in the commission of at least two predicate offenses.'" Dickey v. Kennedy,

583 F. Supp. 2d 183, 188 (D. Mass. 2008) (quoting Mani v. United Bank, 498 F. Supp. 2d 406, 411 (D. Mass. 2007)). Specifically, the defendant "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." United States v. Cianci, 378 F.3d 71, 90 (1st Cir. 2004) (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)).

Plaintiff's RICO conspiracy fails because he fails to allege any underlying predicate RICO offense. But even if Plaintiff adequately pleaded predicate offenses, he still fails to state a RICO conspiracy claim because he has not alleged that Wynn's, Gravina Sr., or Gravina Jr. intended to further a criminal offense by adopting the goals of the alleged enterprise. The Complaint alleges that CAC's scoring system resulted in hidden finance charges in a manner that also created incentives for dealers. However, the mere fact that Wynn's and the Gravinas acted on these incentives in their economic interests is insufficient to show intent to conspire with CAC. See Douglas, 63 F.4th at 56 (affirming dismissal of RICO conspiracy claim where "[t]he complaint alleges a complex series of transactions, many of which . . . are unremarkable" and merely describe standard commercial business interests); Johnson v. U.S. Bank Nat'l Ass'n, No. 09-CV-492, 2010 WL 11538380, at *11-13 (S.D. Ohio May 12, 2010) (dismissing RICO conspiracy claim against bank where plaintiff did not allege more than mere provision of basic services and no facts plausibly supported allegation that bank "agreed to conspire" with the enterprise). Nor does Plaintiff allege any facts that would support that the Gravinas or Wynn's were aware of CAC's hidden finance charge practice, which would be required to show intent to conspire. Accordingly, Plaintiff's RICO conspiracy claim must also be dismissed.

**B. Magnuson-Moss Warranty Act (Count 6)**

In addition to his federal RICO claim, Plaintiff asserts a federal breach-of-warranty claim under the Magnuson-Moss Warranty Act against HMA. He contends that HMA failed to remedy the defect in his Vehicle for nearly a year, thus failing to perform its obligations within a

reasonable time as required under the Act.

To bring a claim in federal court under the Magnuson-Moss Warranty Act, a plaintiff must "meet the Act's jurisdictional requirement that the amount in controversy equal or exceed $50,000." Torres-Fuentes v. Motorambar, Inc., 396 F.3d 474, 475 (1st Cir. 2005) (citing 15 U.S.C. § 2310(d)(3)(B)). Here, the allegations in the Complaint fail to meet that jurisdictional minimum. Neither the Complaint nor the civil cover sheet expressly state the amount in controversy, nor is it plain from the face of the Complaint that the amount in controversy exceeds $50,000. See Renaissance Mktg., Inc. v. Monitronics Int'l, Inc., 606 F. Supp. 2d 201, 210 (D.P.R. 2009) (explaining that "when a plaintiff does not allege a specific amount of damages . . . the Court must examine the complaint to determine whether 'it is facially apparent that the claims exceed the jurisdictional amount'" and "[i]f they do not, then the Court can rely on 'summary-judgment type evidence to ascertain the amount in controversy" (quoting Paul Reinsurance Co., Ltd. v. Greenberg, 134 F.3d 1250, 1253 (5th Cir. 1998))). Reading the allegations in the light most favorable to Plaintiff, the only disputed monetary values in the Complaint are (1) the Bill of Sale of Plaintiff's vehicle, totaling $20,989.63 [Dkt. 1 ¶ 108], and (2) $20,000 in vehicle rental expenses [id. ¶ 219]. Together, these sum up to $40,989.63, which falls short of the $50,000 threshold. Thus, this Court lacks jurisdiction to hear Plaintiff's Magnuson-Moss Warranty Act claim.

### C. Supplemental Jurisdiction (Counts 3 to 5, 7 to 14)

Having found that Plaintiff fails to allege a federal RICO or Magnuson-Moss Warranty Act claim, the Court turns to the remaining claims, all of which are based on state law. Specifically, Plaintiff asserts a claim of fraud against the Gravinas and Wynn's, and claims of breach of the implied warranty of merchantability and fitness, fraudulent and negligent misrepresentation, and a violation of Chapter 93A against HMA.

In a federal-question case, a court has supplemental jurisdiction over state-law claims if they share a common nucleus of operative fact with the federal claims. See 28 U.S.C. § 1367(a); Allstate Interiors & Exteriors, Inc. v. Stonestreet Const., LLC, 730 F.3d 67, 72 (1st Cir. 2013). However, where all federal claims are dismissed and the court's jurisdiction over the remaining claims is based solely on supplemental jurisdiction, a "district court has discretion to decline to exercise supplemental jurisdiction" over the remaining state claims. Uphoff Figueroa v. Alejandro, 597 F.3d 423, 431 n.10 (1st Cir. 2010); see 28 U.S.C. § 1367(c). When deciding whether to exercise that discretion, the court "must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity." Delgado v. Pawtucket Police Dep't, 668 F.3d 42, 48 (1st Cir. 2012); see Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017) (noting that "it can be an abuse of discretion—if no federal claim remains—for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts").

Here, all of Plaintiff's federal claims against Gravina Sr., Gravina Jr., Wynn's, and HMA have been dismissed. The Court has also dismissed CAC and stayed all claims against CCC, finding that the Complaint's claims against them must be resolved before an arbitrator. The only two Defendants who have commenced discovery, Balise and Cape Hy, are subject only to state claims. Thus, the only remaining live claims in the Complaint are state-law claims. See Surman v. MongoDB, Inc., No. 26-CV-00166, 2026 WL 1983554, at *9 (S.D.N.Y. July 9, 2026) (declining to exercise supplemental jurisdiction over non-arbitrable state law claims and staying arbitrable federal claims); cf. Vazquez v. Pershing, LLC, No. CIV. 09-2137, 2010 WL 2541647, at *2 (D.P.R. June 17, 2010) ("Jurisdiction in this case is premised on federal claims, which we find arbitrable. Therefore, we may dismiss the case, including supplemental claims, against

Movants.”). Apart from the filing of the Complaint, briefing on motions to dismiss and to compel arbitration, and an initial scheduling conference, after which two Defendants began discovery, no substantial litigation has occurred. Under these circumstances, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims. See Fraser v. Mass. Bay Transp. Auth., 544 F. Supp. 3d 148, 165 (D. Mass. 2021) (declining to apply supplemental jurisdiction where federal law claims were dismissed and only state law claims remain); see also Humana, Inc. v. Biogen, Inc., 666 F. Supp. 3d 135, 160 (D. Mass. 2023) (same), aff’d, 126 F.4th 94, 102 (1st Cir. 2025).

## IV. CONCLUSION

For the foregoing reasons, Defendants’ Motions to Dismiss [Dkts. 26; 27; 35; 40], which Plaintiff does not oppose, are **GRANTED** as to Plaintiffs’ federal claims, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Accordingly, the claims against Defendants are **DISMISSED** without prejudice to refiling in state court.[2] The Clerk is directed to terminate Defendants, as well as Balise Motor Sales Company and Cape Hy, Inc., as parties to this action.

**SO ORDERED.**

Dated: November 2, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge

[2] Because Plaintiff initiated this suit in federal court, the Court lacks authority to remand rather than dismissing without prejudice. Levin v. Com. Energy, Inc., 560 U.S. 413, 428 (2010).